CONSOLIDATED ENGINEERING SERVICES, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

LB & B Associates Inc., Defendant–Intervenor.

No. 04–1784C.

United States Court of Federal Claims.

Originally Filed Under Seal: Feb. 14, 2005.

Redacted Version Issued for Publication: March 30, 2005.

William A. Roberts, III, Washington, DC, attorney of record for plaintiff.

Douglas K. Mickle, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant.

Frank M. Rapoport, Washington, DC, attorney of record for defendant-intervenor.

## *OPINION*

REGINALD W. GIBSON, Senior Judge.

## I. INTRODUCTION

The action at bar is a post-award bid protest of the second award made pursuant to solicitation NAMA–03–R–0009, issued by the defendant, National Archives and Records Administration (NARA), for consolidated facilities management services at NARA's facilities in Washington, DC (Archives I), and College Park, MD (Archives II). Plaintiff, Consolidated Engineering Services, Inc. (CESI), is the incumbent contractor. On December 2, 2004, NARA awarded the subject contract to intervenor LB & B Associates, Inc. (LB & B). Subsequently, on December 20, 2004, plaintiff filed this protest, alleging numerous procurement violations, and seeking injunctive relief. Currently pending before this court are the parties' January 4, 2005 cross-motions for judgment on the administrative record, filed pursuant to RCFC 56.1. Each of the three parties filed their respective responses to their adversary's[ies'] motion[s] for judgment on January 10, 2005.

Plaintiff alleges five (5) bases for its contention that the government has erred throughout the storied history of this solicitation, and avers that these improprieties re-sulted in an erroneous award to LB & B that cannot stand, as it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. P's Mem. in Support of Mot. for J. at 2. The bases cited by plaintiff are: (i) agency failure to conduct equal and meaningful discussions, (ii) LB & B's alleged improper bait-and-switch scheme with respect to its key personnel designations, (iii) agency failure to reasonably evaluate offerors' price proposals, (iv) flawed cost-technical tradeoff and best value determination by the agency, and (v) agency's refusal to amend the solicitation in light of changed requirements. *Id.* at I. In addition to contesting each of the recited averments of CESI, NARA alleges that this protest is untimely, and alternatively, barred by laches. For reasons fully explicated, *infra*, we DENY plaintiff's motion for judgment on the administrative record, and GRANT defendants' cross-motions for judgment on the administrative record.

## II. FACTUAL BACKGROUND

The facts underlying this bid protest are both numerous and complex. This protest comes before us after two GAO protests and more than twenty (20) months after the issuance of the subject solicitation on April 8, 2003. Thus, an ample record is before the court, upon which we base this decision. Therefore, while we believe it is necessary to recite the relevant facts in significant detail in order to establish the appropriate framework for our decision, additional facts will be presented in our discussion of each of plaintiff's enumerated allegations regarding its entitlement to prevail in this matter.

On April 8, 2003, NARA issued a Request for Proposals (RFP)[1] for services at Archives I and II. The closing date for the submission of proposals was June 9, 2003. Offerors were instructed that they would provide all program management, engineering, and services to operate and maintain said NARA facilities. The RFP stated that NARA intended to award a firm fixed-price contract for a base year, with four (4) option years. Furthermore, the RFP set forth the

---

1. In addition, NARA issued five amendments to the solicitation prior to the (amended) June 9, 2003 closing date. An additional amendment (Amendment No. 06) was issued by NARA on October 28, 2003 to delete the requirement of a Childcare Center Operation.

factors that NARA would evaluate with respect to each offeror's proposal, namely, management approach, technical understanding, relative past performance, and price. The three non-price factors were stated of equal weight, and when combined, were of significantly greater weight than price. Additionally, offerors were informed that the award would be made based on which proposal presented the best value to the government. NARA informed offerors that the procurement would be made *without discussions,* but that offerors would be required to make an oral presentation to NARA regarding the technical content of their proposals. Oral presentations were not permitted to contain price or cost information.

NARA received five proposals in response to its RFP before the June 9, 2003 closing date. Oral presentations began on June 17, 2003. On June 18, 2003, after three presentations had occurred (CESI's, LB & B's, and that of a third offeror), NARA learned that a CESI employee had audiotaped those presentations. CESI's employee turned over the audiotapes to a member of the Technical Evaluation Panel (TEP) on June 19, 2003. The matter was referred to the Office of the Inspector General for investigation into the possible violation of procurement integrity, and the offerors were notified that the award pursuant to the RFP would be delayed. Thereafter, on October 28, 2003, NARA's Director of Acquisition Services sent a letter to all offerors explaining the reason for the delay and the status of the ongoing investigation into the possible violation of procurement integrity. Said letter stated that NARA believed that it could continue with the procurement without discussions, in accordance with the RFP. Moreover, "[n]o technical revisions w[ould][ ] be permitted." AR 880. Attached to the letter sent to offerors was Amendment No. 06, which deleted the RFP requirement for Childcare Center Operations, and thus permitted offerors to revise their price proposals to delete this requirement. Offerors were requested to send any "concerns, questions, recommendations or suggestions" relative to this matter to NARA by October 31, 2003. AR 880.

Upon completion of its investigation, NARA concluded that the integrity of the procurement was intact, and NARA's Head of Contracting Activity advised the contracting officer to proceed with the procurement. The contracting officer drafted a file memorandum documenting the course of the investigation, and included the revised pricing that resulted from Amendment No. 06. Said memorandum noted that the relative standing of the offerors' price proposals remained unchanged.

Concurrent with the investigation and resolution of the taping incident, NARA continued its evaluation of the offerors' proposals. Each offeror's technical proposal was evaluated by each of the three members of the TEP. The members' initial evaluations were conducted independently, *i.e.,* the members did not discuss the proposals among themselves. These individual evaluations were completed on July 23, 2003. Between July 24, 2003 and July 29, 2003, the TEP met and reached a consensus regarding the technical ratings for each offeror. On August 4, 2003, the TEP forwarded its evaluations, and concluded that three offerors, including LB & B and CESI, were technically equivalent, each receiving an overall technical rating of "BETTER." The two remaining offerors received overall ratings of [ ]. So concluding, the panel recommended that the NARA award the contract to the lowest-priced offeror of the three candidates who each received an overall technical rating of "BETTER." AR 807. Upon completion of the investigation into the taping incident on December 1, 2003, the contracting officer submitted the offerors' price proposals to the TEP.

On or about December 10, 2003, the TEP—now armed with offerors' price proposals—met again. LB & B's total price of $52,857,601.56 for the base year and four option years was revealed as the lowest among the three offerors who received a technical rating of "BETTER." CESI's proposal offered a price of more than [ ] greater than LB & B's price. Thereafter, on December 16, 2003, NARA requested that LB & B submit its subcontracting plan.[2] LB

---

**2.** The acceptance of LB & B's subcontracting plan, and the negotiations between NARA and

& B submitted its subcontracting plan on December 18, 2003. Upon review by the contract specialist and contracting officer, the agency found that LB & B's plan generally complied with the requirements set forth in the RFP, but submitted it to the Small Business Administration (SBA) for review and comment.[3] NARA related the SBA's comments to LB & B on January 16, 2004, and asked LB & B to revise its subcontracting plan in accordance therewith. LB & B transmitted its revised subcontracting plan to NARA on January 23, 2004.

The TEP memorialized its best value determination via a signed memorandum dated February 11, 2004. Therein, the TEP stated that LB & B's proposal offered the best value to the government, and recommended award to LB & B—the lowest-price offeror that received an overall technical rating of "BETTER." AR 993–995. The contracting officer issued her source selection decision on February 27, 2004, and awarded the contract to LB & B. Said award contemplated an April 1, 2004 commencement date for LB & B.

By letter dated March 9, 2004, LB & B advised NARA that they intended to substitute [ ] of the [ ] "key personnel" designated in their June 9, 2003 proposal.[4] NARA accepted these substitutions. CESI received a debriefing with respect to the evaluation of their proposal, at CESI's request. Said debriefing included LB & B's total contract price. Thereafter, on March 19, 2004, CESI filed a protest with the Government Accountability Office (GAO) challenging the award to LB & B. Pursuant to GAO rules, a temporary stay of the procurement went into effect as a result of the protest. NARA did not override the automatic stay, and instead extended CESI's contract for the period of the protest.

In its March 19, 2004 protest before the GAO, CESI averred six (6) grounds upon which it alleged its protest should be sustained. Specifically, CESI claimed that the agency: (i) failed to evaluate and/or document its evaluation of offerors' proposals in a manner that reasonably supports its best-value award, (ii) failed to conduct equal and meaningful discussions, (iii) failed to reasonably evaluate and downgrade LB & B's proposal in light of LB & B's alleged bait-and-switch campaign with respect to key personnel, (iv) failed to reasonably evaluate LB & B's cost proposal for cost realism and/or inclusion of Collective Bargaining Agreement (CBA) wage rates, (v) unreasonably evaluated both LB & B's and CESI's proposals respective to the past performance evaluation factor, and (vi) failed to conduct or conducted a flawed cost/technical tradeoff, leading to an unreasonable best-value determination.

The GAO conducted an "outcome prediction" conference call with CESI, NARA, and LB & B on May 11, 2004. During said teleconference, GAO counsel indicated that the majority of CESI's claims appeared to lack merit, but CESI's claim regarding the agency's evaluation of offerors' past performance appeared meritorious. Consequently, on May 13, 2004, NARA informed the GAO that it would take corrective action, specifically, (i) rescinding the award to LB & B, (ii) re-evaluating the past performance factor, and (iii) making a new source selection, based upon all evaluation factors set forth in the RFP, including the re-evaluated past performance factor. Accordingly, the GAO issued a decision dismissing CESI's bid protest as academic.

CESI, in correspondence with NARA, urged the agency to open discussions with respect to all of the issues cited by CESI in its GAO protest. The contracting officer, upon consultation with the TEP, concluded that the interceding procurement delays war-

LB & B with respect thereto, are discussed in detail regarding CESI's claim that it did not receive equal and meaningful discussions, Part IV.C., *infra*.

3. LB & B and NARA contend that this process complies with the RFP and FAR § 19.705–5(a)(3); CESI argues that such actions constitute improper discussions. *See*, Part IV.C., *infra*.

4. This substitution, and a subsequent key personnel substitution made by LB & B, form the basis for CESI's allegation that LB & B has employed an improper bait-and-switch with respect to key personnel. As such, we address the relevant facts in detail at Part IV.D., *infra*.

ranted limited discussions in the areas of key subcontractor and key personnel. Both the TEP and the contracting officer concurred that these areas were the only areas that required updating due to the passage of time. LB & B and CESI were notified of NARA's decision on July 29, 2004, and were instructed to submit said revisions by August 5, 2004.

On August 2, 2004, CESI requested that NARA permit them additional time to provide the updated information. Moreover, CESI asked NARA to update the RFP's requirements to reflect the progress of renovations to the facilities that were then complete. Further, the plaintiff sought to update its pricing proposal based on the renovations and new CBAs and Department of Labor wage determinations. NARA refused CESI's requests. Both CESI and LB & B submitted revised key personnel information by the August 5, 2004 deadline; CESI substituted [ ] of its [ ]key personnel, and LB & B substituted [ ] of its [ ] key personnel.[5] Neither offeror changed their key subcontractor information. Concurrent with its timely submission to NARA, CESI filed its second protest with the GAO on August 5, 2004.

CESI grounded its second protest on three bases, namely, NARA's alleged failure to: (i) provide CESI with a reasonable time to submit the requested updates, (ii) amend the solicitation and permit offerors to amend their pending proposals accordingly, and (iii) permit CESI to revise its technical and cost proposals in light of discussions that allegedly occurred during the procurement. GAO denied this protest in its entirety by written opinion dated October 25, 2004.

After the GAO denied CESI's second protest *in toto*, the TEP proceeded to re-evaluate the "Staffing" technical subfactor based upon the updated key personnel provided by the offerors. On December 1, 2004, the TEP forwarded its Consensus Summary Evaluation Report to the contracting officer. That report rated CESI as [ ] for [ ] technical factors, thus CESI received an overall rating of [ ]. AR 2768–71. LB & B received a [ ] rating for two of the three technical factors, and a [ ]rating for the third factor, Relative Past Performance. Nonetheless, the TEP concluded that LB & B's overall proposal deserved a rating of "BETTER." AR 2771–73. The contracting officer issued a new source selection decision on December 2, 2004, finding that the two offerors' respective weaknesses offset each other. Consequently, the contracting officer determined that LB & B's proposal offered the best value to the government, and awarded the contract accordingly. On the same date, NARA issued a second notice to proceed to LB & B with a January 3, 2005 commencement date. On December 3, 2004, CESI requested a second debriefing, which NARA provided, in writing, on December 7, 2004. CESI filed its notice of intent to file a bid protest with this court on December 14, 2004, and served the same on defendant, in accordance with RCFC Appendix C. Thereafter, on December 20, 2004, CESI filed this bid protest in our court.

To aid the court's expeditious adjudication of this matter, the defendant and intervenor agreed to forebear from proceeding with the contract pending our decision on the merits. Thus, in light of this concession, CESI withdrew its motion seeking a temporary restraining order and a preliminary injunction. The parties filed the instant motions for judgment on the administrative record, along with their respective statements of fact, on January 4, 2005. Responses thereto were filed by the parties on January 10, 2005. We now decide the merits of this protest.

### III. JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b), and reviews bid protests under the standards set forth in the Administrative Procedures Act. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001). Thus, we review agency actions to determine whether they were arbitrary, capricious, an abuse of discretion, or otherwise not in accor-

---

**5.** LB & B's key personnel changes were in addition to its March 9, 2004 key personnel changes.

dance with the law. 5 U.S.C. § 706. Against this background, our role is not to substitute our judgment for that of the agency. *CRC Marine Servs. Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Instead, we shall only set aside an award if the plaintiff demonstrates that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332 (citations omitted). Furthermore, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). Demonstrating prejudice, in the context of bid protests, requires the protestor to establish that, absent the procurement error, the protestor had a substantial chance of receiving the award. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996).

Faced with the aforementioned limits on the scope of our review, we also note that we are not bound by prior decisions of the GAO with respect to the instant solicitation, or its holdings in similar protests. Nonetheless, this court recognizes the special expertise of the GAO in the arena of procurement protests. *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997). Moreover, we are "especially reluctant to interfere with the procurement process when, as here, the GAO has upheld the contracting officer's decision." *Howell Constr. Inc. v. United States,* 12 Cl.Ct. 450, 452 (1987). Thus, to the extent that we find such decisions "reasonable and persuasive in light of the administrative record," we shall accord such decisions deference. *Id.*

Upon careful review of the administrative record before us, we conclude that the parties' opposing contentions center on contrary interpretations of the legal significance of a set of common facts. In other words, this protest does not involve a disputed set of facts; instead, only opposing legal theories with respect to those facts. As such, this case is—as the parties have indicated via their cross-motions for judgement on the administrative record—appropriate for disposition in accordance with RCFC 56.1.

## IV. DISCUSSION

As we noted in our introduction, plaintiff raises five separate bases for this protest in its motion for judgment on the administrative record. Specifically, CESI alleges the following:

(i) agency failure to conduct equal and meaningful discussions,

(ii) LB & B's alleged unlawful bait-and-switch scheme,

(iii) agency failure to reasonably evaluate offerors' price proposals,

(iv) flawed cost-technical tradeoff and best value determination by the agency, and

(v) agency's refusal to amend the RFP in light of changed requirements.

LB & B and NARA both contest the above-cited allegations. Furthermore, NARA sets forth two additional grounds that it contends support its cross-motion for judgment on the administrative record, which are (i) that this protest is untimely, and alternatively, (ii) barred by laches. Because NARA's averments of untimeliness and bar by laches, if true, preclude this court's review of plaintiff's substantive allegation, we begin our discussion there.

### A. Timeliness of Protest

The defendant's first argument for denying CESI's protest is based on the GAO's timeliness rules. Mindful that GAO rules regarding the timeliness of filing bid protests are not binding on this court, NARA urges the court to consider their application in this case. Parties bringing procurement protests before the GAO must do so in accordance with 4 C.F.R. § 21.2(a), which provides in pertinent part that:

(1) Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for initial proposals shall be filed prior to bid opening or the time set for initial proposals.

(2) Protests other than those covered by paragraph (a)(1) of this section shall be filed no later than 10 days after the basis of protest is known or should have been known. . . .

In the case *sub judice,* NARA argues that CESI should have followed the GAO rules, at least to some degree, in its action before this court. Moreover, the defendant cites ample precedent for the proposition that, while not binding, the GAO timeliness rules have utility in actions before the United States Court of Federal Claims. *See, e.g., N.C. Div. of Servs. for the Blind v. United States,* 53 Fed.Cl. 147, 165 (2002)(citing *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994), *aff'd* 39 F.3d 1198 (Fed.Cir.1994)).

CESI opposes the application of the GAO timeliness rules here for two reasons: (i) CESI cites opposing precedent, and (ii) procedural impropriety for dismissing for timeliness when the only open motions before the court are cross-motions for judgment on the administrative record, *i.e.,* call for a decision on the merits of its protest.

█ Taking first the opposing precedent cited by CESI,[6] CESI is correct that there is no clear mandate in the caselaw for the imposition of GAO timeliness deadlines with respect to cases before this court. Nor, in fact, is NARA contending there is. The cases make it clear that the judges of this court are divided on this issue,[7] and none have taken the position that the GAO rules are binding on this court. Thus, we hold that we may impose GAO timeliness rules in their entirety or as general guidelines if we deem the facts on record warrant such treatment.

Based on the record before us, and the current posture of the matter at bar, we do not feel that this matter should be dismissed as untimely. In reaching this decision, we note that CESI has a valid point that the motions before this court require resolution on the merits. While we determine that this protest is not barred as untimely, we are not wholly unmoved by NARA's position. Contrary to CESI's contention that it has not argued that the solicitation itself is flawed, but instead seeks to enforce the terms of the RFP, we note that one of CESI's bases for this protest is that the solicitation required amendment, and offerors were entitled to revise their proposals in light of "substantial changes" to NARA's requirements. That ground,[8] which GAO determined insufficient to sustain a protest in its October 25, 2004 opinion, clearly relates to improprieties in the RFP's terms. Furthermore, we are troubled by CESI's delay in filing this protest in light of the proposed January 3, 2005 contract commencement date for the second award to LB & B. This is so because CESI was debriefed with respect to the second award decision on December 7, 2004, yet waited until December 14, 2004 to file its notice of protest, pursuant to RCFC Appendix C. Said rule requires a protestor to file a notice of protest at least twenty-four (24) hours prior to filing the protest itself in this court. CESI, however, waited until December 20, 2004 to file its protest, which made it wholly impossible for this court to decide the merits of the case prior to the contemplated contract commencement date of January 3, 2005—then, a mere seven (7) business days hence. Consequently, while we shall not impose the GAO timeliness rules, we will revisit the factual predicates underlying NARA's argument when we address the propriety of injunctive relief, *infra.*[9]

### B. Applicability of the Doctrine of Laches

In addition to citing GAO's timeliness rules, NARA proffers the argument that CESI's protest should be denied for laches. Based upon the rationale set forth in the previous subsection, we also decline to dispose of this case based upon the doctrine of

---

**6.** In all fairness, NARA directed the court to precedent contrary to its argued position, and contended, in essence, that this court has broad discretion to apply GAO timeliness rules as guidelines when the facts of a particular case so warrant.

**7.** *Compare, Wit Assocs., Inc. v. United States,* 62 Fed.Cl. 657 (2004), *with N.C. Div. of Servs.,* 53 Fed.Cl. at 165.

**8.** Said basis is explored in detail in Part IV.G., *infra.*

**9.** As CESI itself cites, "delay in bringing a protest undoubtedly may be considered in the multi-factored analysis of whether injunctive relief is warranted...." P's Resp. to D's Mem. in Support of Mot. for J., at note 6 (quoting *Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. 533, 535 (2003) (citations omitted)).

laches, due in part to the nature of the motions currently pending before this court. As we noted above, however, NARA's factual basis for asserting a defense of laches shall be included in this court's discussion regarding the propriety of injunctive relief, *infra*. We turn now to the merits of this protest.

## C. Equal and Meaningful Discussions

With respect to its argument that CESI was deprived of equal and meaningful discussions regarding its proposal, CESI avers several discrete, yet intertwined, contentions. First, CESI claims that when NARA contacted LB & B and requested its subcontracting plan, which was then reviewed by the SBA and returned to LB & B with comments that NARA permitted LB & B to incorporate prior to the first award decision, these actions constituted discussions.[10] In so doing, CESI claims that, since discussions occurred with respect to LB & B, CESI should have received equal treatment. Second, the plaintiff argues that, during the agency's corrective action following CESI's first GAO protest, NARA specifically opened discussions with respect to key personnel and key subcontractors. Thus, CESI presents two additional arguments: (i) the agency's decision to open discussions with respect to the aforementioned proposal information has the effect of permitting wholesale revisions to offerors' proposals,[11] and (ii) NARA's identification of a deficiency—discovered after discussions closed—respecting CESI's key subcontractor for [ ] under the contract required NARA to reopen discussions to permit CESI to correct this deficiency.[12] We shall address each of these allegations *seriatim*, along with NARA's and LB & B's contrary contentions.

10. Bootstrapped to this contention is CESI's assertion that LB & B's failure to submit a subcontracting plan with its proposal required the agency to reject LB & B's proposal in its entirety as non-responsive. Thus, we shall address the issue of whether the RFP required subcontracting plans with proposals as a preliminary matter with respect to this issue.

11. CESI raised this issue in its second GAO protest, and the GAO found it wholly meritless.

1. LB & B's Submission and Revision of its Subcontracting Plan.

 Before we can address whether or not NARA's permitted revisions with respect to LB & B's subcontracting plan constituted improper discussions, we must first address CESI's contention that LB & B's proposal was non-responsive due to LB & B's failure to include said plan with its proposal. In this regard, CESI contends that the RFP clearly and unambiguously required all offerors to submit an acceptable subcontracting plan with its proposal.

Supporting its contention that the solicitation required offerors to submit their subcontracting plans with their proposals, CESI cites to the Administrative Record at page 99,[13] which states that:

The Contractor must submit a subcontracting plan (see **Attachment 14**) that demonstrates a good faith effort designed to meet the following Small, Small Disadvantaged and Women–Owned Small Business minimum goals will (*sic*) apply to this requirement: Small Businesses—20% of the total value of the contract; Small Disadvantaged Businesses—5% of the total value of the contract; and Women Owned Small Businesses—5% of the total value of the contract. (See **Exhibit A, Data Requirement Item 0003,** *Subcontracting Plan/Report*) (*sic*) Ensure that all requirements including the minimum performance standards of this contract are met.

The above-cited text is contained in the Performance Work Statement (PWS). We note that the recited text does not indicate that the subcontracting plan is due with the proposal. Attachment 14 cited therein, however, does state on its face "(Note: Submit with proposal)". AR 541. Additionally, Exhibit

12. CESI also argues that this cited "deficiency" was not a deficiency, and avers that the agency erred in so determining. We address this contention as part of our discussion regarding NARA's cost/technical tradeoff and best-value determination, Part IV.F., *infra*.

13. CESI's Statement of Facts at para. 5 cites to AR 66 for this proposition. Upon finding no support for CESI's contentions on the cited page, the court found that CESI elsewhere cited AR 99, which corresponds to page 66 of the solicitation.

A, Data Requirement Item 0003, subcontracting Plan/Report (also cited above), states that the "[d]ate of first submission" of this item is "[w]ith proposal." AR 568. Thus, CESI is correct that both an attachment to, and an exhibit for, the solicitation indicate that subcontracting plans are due with the proposal submissions.

NARA and LB & B, however, point to the Instructions to Offerors—a detailed list of all submission items that each proposal must contain. Subcontracting plans are notably absent from this list. Furthermore, the solicitation expressly incorporates FAR § 52.219–9, Small Business Subcontracting Plan, as an addenda to the solicitation. The incorporated provision states, in pertinent part, that "[t]he offeror, upon request by the Contracting Officer, shall submit and negotiate a subcontracting plan...." FAR § 52.219–9(c). Thus, we must conclude that an addendum to the solicitation expressly contemplates that a subcontracting plan is due "upon request by the Contracting Officer." FAR § 52.219–9(c). As a consequence, we conclude that the solicitation was ambiguous with respect to subcontracting plan submissions, in that the RFP provisions cited by CESI are contrary to the provision cited by the defendant.

The solicitation contains a clause that sets forth the order of precedence in the event of inconsistencies within the solicitation. Said clause specifically states that "[a]ny inconsistencies in this solicitation shall be resolved by giving precedence in the following order:...(4) Addenda to this solicitation or contract, ... (8) Other documents, exhibits, and attachments, (9) The specification." AR 45–46. Applying the foregoing to the facts set forth, *supra*, we are constrained to conclude that the ambiguity created by the contrary requirements set forth in Exhibit A and Attachment 14 as opposed to the requirements set forth in the addenda expressly incorporating FAR § 52.219–9(c) must be resolved in favor of the addenda, as addenda provisions trump exhibits and attachments.[14] Hence, FAR § 52.219–9(c) controls, which, as noted, contemplates that the contracting officer shall request a subcontracting plan from an offeror. Thus, we hold that LB & B's proposal was not non-responsive by reason of its failure to include a subcontracting plan.[15]

Our holding is further reinforced in light of FAR § 19.702(a)(1), which provides that a subcontracting plan shall be required from the "apparently successful offeror." LB & B was such an offeror at the time the contracting officer requested that it submit its subcontracting plan (January 16, 2000). This fact fits neatly into CESI's contention that this request, in conjunction with the contracting officer's submission of LB & B's subcontracting plan to the SBA and then returned the SBA's comments to LB & B for the purpose of allowing LB & B to incorporate said comments, constituted discussions.

 As CESI notes, "the acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for quotations or proposals to be revised or modified." P's Mem. in Supp. of Mot. for J at 19 (citing *Priority One Services, Inc.*, B–288836.2, Dec. 17, 2001, 2002 CPD ¶ 79, 2001 WL 1872433, at *4, 2001 U.S. Comp. Gen. LEXIS 205, at *11 (citations omitted)). And, "[i]f the agency decides to award the contract after holding discussions, it must hold discussions with all responsible offerors within the competitive range." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1318 (Fed.Cir. 2003) (citations omitted). Furthermore, "offerors responding to discussions may revise aspects of their proposals beyond the scope of the discussions absent an agency's deci-

---

14. To the extent that the text of the PWS that cites Attachment 14 and Exhibit A arguably implies that subcontracting plans are required with the proposal, our decision is unchanged. This is so because the PWS falls into the "specification" category of provisions, and is thus ninth and last in the order of precedence set forth in the precedence clause.

15. We further note for the record that CESI's subcontracting plan was not evaluated by the TEP, nor did the solicitation include the subcontracting plan under any technical evaluation category, although technical factor T1.2—*Staffing* did consider key personnel and key subcontractor information. Thus, CESI's relative technical standing with respect to the award was not affected by its subcontracting plan, nor does it contend otherwise.

sion, in appropriate circumstances, to limit the revisions offerors could make after the conduct of discussions." *ABF Freight Sys., Inc. v. United States,* 55 Fed.Cl. 392, 402–402 (2003) (citing *Rel–Tek Sys. & Design, Inc.,* B–280463.7, July 1, 1999, 99–2 CPD ¶ 1, 1999 WL 485035). Thus, CESI argues that, faced with the foregoing, when NARA submitted comments to LB & B on its subcontracting plan, and permitted LB & B to incorporate those comments into a revised subcontracting plan, discussions were triggered such that CESI was entitled to revise its proposal wholesale and correct any deficiencies therein. We cannot agree.

We noted, *supra,* that FAR § 19.702(a)(1) provides that a subcontracting plan shall be required from the "apparently successful offeror," (here, LB & B), and states that said offeror shall be ineligible for award "[i]f the apparently successful offeror fails to negotiate a subcontracting plan acceptable to the contracting officer within the time limit prescribed by the contracting officer." FAR § 19.702(a)(1). Furthermore, FAR § 19.705–4 sets forth the additional requirement that "[t]he contracting officer must review the subcontracting plan..." and provides this instruction: "In determining the acceptability of a proposed subcontracting plan, the contracting officer should take the following actions:...(7) Obtain advice and recommendations from the SBA procurements center representative (if any) and the agency small business specialist." FAR § 19.705–4(d). Therefore, we are constrained to hold that the agency actions in requesting LB & B's subcontracting plan, and negotiating with LB & B to ensure that the subcontracting plan was acceptable, was not only contemplated by the FAR, but required by it. Additionally, the plain language distinguishes these communications from the broad discussions contemplated by FAR § 19.305 in that it is clear that *only* the "apparently successful offeror" need be engaged in subcontracting negotiations, and such negotiations are patently not of the type that permit offerors to revise their proposals. Our holding here is further bolstered by the holding in *Kahn Instruments,* B–277973, Dec. 15, 1997, 98–1 CPD ¶ 11, 1997 WL 811931, 1997 U.S. Comp. Gen. LEXIS 493,

wherein the GAO held that "subcontracting plan[s] relate[ ] to an offeror's responsibility, even where the solicitation requests the offeror submit the plan with its proposal. *A.B. Dick Co.,* B–233142, Jan. 31, 1989, 89–1 CPD ¶ 106 at 3, 1989 WL 240388. Thus, we have found that an agency's request for a subcontracting plan does not constitute discussions or require that revised proposals be solicited from all offerors. *Id.* n. 7." Kahn, 98–1 CPD ¶ 11, 1997 WL 811931, at *8, 1997 U.S. Comp. Gen. LEXIS 493, at *22.

2. The Propriety and Effect of the "Limited Discussions" Regarding Key Subcontractors and Key Personnel.

CESI's second argument respective to its claim that it was denied equal and meaningful discussions centers on the corrective action taken by NARA in response to the "outcome prediction" conference call held in connection with CESI's first protest. During that call, the GAO attorney indicated that CESI's allegation regarding the evaluation of offerors' past performance appeared meritorious. Thus, NARA took corrective action based on the GAO's comments by re-evaluating offerors' past performance and issuing a new source selection decision. In addition, the contracting officer determined that due to almost thirteen (13) months that had elapsed between the submission of proposals on June 9, 2003 and the implementation of corrective action in late July, 2004, some additional updates to the proposals were necessary. Consequently, on July 29, 2004, the contracting officer issued the following instructions to LB & B and CESI, in relevant part:

> Pursuant to the notice of corrective action issued by the National Archives and Records Administration (NARA) on May 13, 2004 in reference to Solicitation No. NAMA–03–R–0009 for Consolidated Facilities Management Services at Archives I & II, NARA is in the process of re-evaluating past performance. In addition, because of the length of time since proposals were submitted, NARA has determined that it is necessary to hold limited discussions to obtain updated key personnel and key subcontractor information. To maintain the integrity of this solicitation and because

NARA has determined that only limited discussions on the issue of key personnel and key subcontractors are necessary, NARA will only accept revisions of key personnel and key subcontractor information. Please submit revised key personnel and subcontractor information, as outlined in the solicitation paragraphs 4.1 Key Personnel and 6.2 Key Subcontractors, and any amendments thereto, by no later than 3:00 PM, Thursday, August 5, 2004.

Due to the length of time that has passed since proposals were submitted, we hereby request that you confirm that your offer is still open and eligible for award.

AR 2640.

CESI complied with the issued instructions, above, but also filed its second GAO protest on August 5, 2004. In that unsuccessful protest, CESI alleged, *inter alia,* that the contracting officer improperly limited discussions to the areas of key personnel and key subcontractors. Thus, CESI seeks redress for that alleged violation here; the following subsection explores the validity of CESI's claim with respect to the propriety of the contracting officer's decision to limit discussions. Additionally, CESI asserts a second related argument here, namely, that the deficiency the TEP noted with respect to CESI's [ ] subcontractor should have been brought to their attention for revision prior to the award decision. That argument is explored in subsection IV.C.2.b., *infra.*

a. The propriety of "limited discussions." [16]

■ CESI contends that the contracting officer exceeded the scope of the corrective action recommended by the GAO, and since NARA exceeded the scope of the recommendation, it should be required to go further. In effect, CESI argues that when NARA permitted discussions on the limited areas of key personnel and subcontractors, it opened a Pandora's box that it cannot shut. Stated differently, by permitting some discussions, CESI avers that NARA could not impose a limit on the discussions, nor the revisions it

would accept. As a consequence, CESI urges this court to permit it to engage in wholesale proposal revisions, including new price proposals.

We noted, *supra,* that the GAO has already heard this argument, and found it wholly without merit. *See, Consolidated Eng'g,* B–293864.2, Oct. 25, 2004, 2004 CPD ¶ 214, 2004 WL 2480936, 2004 U.S. Comp. Gen. LEXIS 225. In its October 25, 2004 opinion, the GAO held that, in the course of implementing corrective action, an agency "may reasonably decide to limit the revisions offerors may make to their proposals. [And,] [a]s a general matter, the details of implementing a recommendation for corrective action are within the sound judgment of the contracting agency." *Consolidated Eng'g,* 2004 CPD ¶ 214, 2004 WL 2480936, at *2, 2004 U.S. Comp. Gen. LEXIS 225, at *7 (citations omitted). Continuing its analysis, the GAO stated:

> The agency's approach to determining the appropriate corrective action here reflected its sensitivity to the fact that LB & B's prices had been revealed when the original award was made. While it may have been within the agency's broad discretion to permit price revisions without regard for the creation of an auction, the agency was not precluded from taking this consideration into account; there was nothing improper in the agency's choosing a more limited approach to avoid creating a competitive advantage that unquestionably would inure to the benefit of the protestor.

*Consolidated Eng'g,* 2004 CPD ¶ 214, 2004 WL 2480936, at *3, 2004 U.S. Comp. Gen. LEXIS 225, at *8–9 (citations omitted).

CESI also argues that permitting key personnel and key subcontractor updates inured to the benefit of LB & B only. As we will explore in greater detail in the context of CESI's allegations that LB & B has engaged in an unlawful bait-and-switch with regard to its key personnel (Part IV.D., *infra*), we find this argument unpersuasive in light of the

---

**16.** This issue is discussed in a different light at Part IV.G., *infra.* In said section, we discuss the validity of CESI's claim that the solicitation should have been amended, and revised proposals accepted, due to "substantial changes" in NARA's requirements that arose due to the passage of time.

fact that CESI itself took advantage of the opportunity afforded to it via the corrective action by substituting [ ] of its [ ] key personnel designations. Thus, CESI undoubtedly benefitted from the opportunity to update its key personnel, as did LB & B.

We are persuaded that the GAO's determination is correct under the facts of this record. Furthermore, we fail to see merit in CESI's assertion that only LB & B benefitted from the proposal revisions. Thus, we hold that the agency's decision to expand the scope of the corrective action to permit revisions to key personnel and subcontractors was reasonable, as was its decision to limit revisions to those aforementioned areas.

b. The effect of "limited discussions."

■ The plaintiff additionally contends that, even if the "limited discussions" permitted in the course of the agency's implementation of corrective action did not entitle it to revise other areas of its proposal, NARA had an obligation to convey any deficiencies found with respect to key personnel and key subcontractors to CESI, and CESI should have had the opportunity to revise its proposal to correct those deficiencies. Specifically, NARA's identification of a deficiency—discovered after the time period for revisions closed [17]—respecting CESI's key subcontractor for [ ][18][ ] under the contract required NARA to reopen discussions to permit CESI to correct this deficiency. Furthermore, CESI avers that the deficiency prejudiced it because it alleges that the deficiency was a determinative factor in the award decision.

In sharp contrast, the defendants argue that (i) identifying the deficiency after the time for revisions had elapsed did not require NARA to inform CESI nor permit additional revisions, (ii) the request for limited updates did not constitute discussions, and (iii) even if

NARA should have notified CESI of the deficiency and permitted further revisions, CESI was not prejudiced by NARA's failure in this regard.

The key premise upon which CESI bases its entire argument is that NARA conducted discussions: first, with LB & B regarding its subcontracting plan, and then with both offerors regarding key subcontractors and key personnel specifically. We have already ruled, *supra*, that the negotiations between NARA and LB & B regarding the latter's subcontracting plan did not constitute discussions. Therefore, we are left to determine whether NARA's July 29, 2004 directive to offerors regarding key personnel and key subcontractor updates was, in fact, discussions. In this regard, CESI's assertions are (i) NARA itself categorized the request as "limited discussions," and (ii) the request for updated information qualifies as discussions pursuant to FAR § 15.306(d), which states that "discussions" are "exchanges . . . between the government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal." FAR § 15.306(d). Said provision continues, requiring "[a]t a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR § 15.306(d)(3). Lacking said information, discussions are not meaningful, as the FAR contemplates. *See, e.g., ManTech Telecom. & Info. Sys. Corp. v. United States*, 49 Fed.Cl. 57, 76 (2001).

It is clear that the contracting officer's July 29, 2004 request [19] for updated key personnel and key subcontractor information was "undertaken with the intent of allowing the offeror to revise its proposal." FAR § 15.306(d). Furthermore, the record evi-

17. This alleged deficiency was first brought to CESI's attention on December 7, 2004, via NARA's written debrief regarding the second award decision.

18. CESI contends that this is a "sham" deficiency, as it proposed to complete the [ ] itself, without subcontracting. It notes that this situation is permitted under the RFP. We decline

to discuss this matter further, as the only issues necessary for our decision are whether this stated deficiency prejudiced CESI, and whether CESI should have been given the opportunity to correct said deficiency.

19. Quoted, in relevant portion, at Part IV.C.2., *supra*.

dence fails to indicate that NARA informed either LB & B or CESI of any deficiencies or significant weaknesses regarding their respective key personnel/subcontractor designations. Instead, the contracting officer merely afforded the offerors the opportunity to update stale information due to the delays in the procurement process. The updated information was, however, used by the TEP and the contracting officer to evaluate technical subfactor T1.2—Staffing. As such, it must be categorized as a "proposal revision" as referred to in FAR § 15.306(d). Thus, we are constrained to conclude that the contracting officer's request for updated information did, in fact, constitute limited discussions. Hence, CESI should have been informed of any deficiencies therein in order for those discussions to be meaningful.

■ Our determination that CESI should have been informed regarding its [ ] subcontractor deficiency is unaffected by the fact that this deficiency was not noted until after discussions ended. As CESI notes, "[i]f during the reevaluation of proposals the agency identifies concerns that would have had to be raised had they been identified before discussions were held, the agency is required to reopen discussions in order to raise the concerns with the offerors." *DevTech Sys, Inc.*, B–284860.2, Dec. 20, 2000, 2001 CPD ¶ 11, 2000 WL 33128768, at *3, 2000 U.S. Comp. Gen. LEXIS 199, at *9. Consequently, we hold that CESI should have been given the opportunity to correct the deficiency noted with respect to its [ ] subcontractor. Thus, we necessarily turn to the issue of whether CESI was prejudiced by the government's failure to permit CESI to correct this deficiency.[20]

Prejudice, the plaintiff argues, should be both (i) presumed in the face of our finding that CESI did not receive meaningful discussions, and (ii) found based on record evidence that this deficiency caused a lowering of its technical evaluation score. First, we note that CESI does not (and cannot) argue that

any presumption of prejudice that *may* arise in the face of an absence of meaningful discussions is irrebuttable. Second, we cannot agree that the record evidence supports a finding of prejudice under these facts; instead, as we explain in detail in the following paragraphs, the record supports the defendants' position that no prejudice inured to CESI as a result of the uncorrected "deficiency."

Turning to the record evidence, we note that the TEP's first evaluation of offers failed to identify the [ ] deficiency, and thus, said deficiency was clearly not factored into CESI's evaluation. Absent the subsequently-identified deficiency, the TEP concluded that CESI was entitled to a rating of [ ] for the T1—Management Approach (under which subfactor T1.2—Staffing[21] considers key personnel/subcontractors). When the TEP took note of the deficiency during its re-evaluation, it nonetheless determined that CESI was still entitled to a rating of [ ] for the applicable technical factor. No other subfactors were re-evaluated. Thus, it does not appear that the deficiency adversely affected CESI's technical rating for factor T1—Management Approach.

Also on its first evaluation, CESI received an *overall* rating of [ ], receiving a [ ] rating for both T1—Management Approach and T2—Technical Understanding, and a [ ] rating for T3—Relative Past Performance. Conversely, LB & B received [ ] ratings across the board, and thus, an overall rating of [ ]. Given such, the TEP concluded that the offerors were technically equivalent, and therefore, the low-cost provider should be awarded the contract.

The second evaluation conducted by the TEP (which included the re-evaluation of T1.2—Staffing, and T3—Relative Past Performance) concluded that CESI deserved ratings of [ ] across the board. On the other hand, LB & B received ratings

**20.** The issue of prejudice is revisited at Part IV.F.1., *infra.*

**21.** For the sake of clarity, the solicitation stated (and the TEP confirmed in its evaluation) that

the subfactors under T1—Management Approach (T1.1—Management Procedures, T1.2—Staffing, and T1.3—Quality Control) are weighted in descending order of importance.

of [ ] for factors T1 and T2, and a rating of [ ] for T3—Relative Past Performance. Hence, the ratings of the two offerors were, in essence, [ ] with the other offeror in relation to the first evaluation. And once again, the TEP determined that the two proposals were technically equivalent, just as it had when the "shoe was on the other foot," figuratively speaking. Consequently, LB & B, who offered a more than [ ] price advantage over CESI, received the award for the second time.

In its briefs to the court, CESI characterizes [ ] deficiency as "critical" and "decisive" in the award decision, and states that, if CESI had "[t]he opportunity to address the Agency's concerns [22] [it] clearly would have resulted in increased technical evaluations." P's Mem. in Support of Mot. for J. at 20. As evidence of its "decisive" affect on the award determination, CESI notes that "[t]he Agency found that LB & B's proposal on [[ ] factor, [ ]][ ] was 'slightly superior' to CESI's proposal, and that this 'offset' the advantage CESI enjoyed under the [ ] factor, thus justifying the award to LB & B as the lower-priced offeror." *Id.* (citing AR 3168). Our independent reading of the record evidence does not support these contentions.

CESI is correct that the contracting officer found that LB & B's proposal with respect to factor [ ] was "slightly superior" to CESI's. What CESI fails to address, however, are the positive comments LB & B received with respect to not only [ ], but also [ ] (which was not re-evaluated).[23] For example, the contracting officer's Best Value Decision noted that "CESI's [ ] plan provides the processes [ ]," while LB & B's "[ ]." *Id.* Thus, even if CESI's [ ] rating was not deficient in any way, and CESI therefore received only positive comment for this factor (as LB & B did), the record evidence still supports the conclusion that LB & B's overall [ ] was

"slightly superior" to CESI's, based upon LB & B's advantage under [ ].

Furthermore, the contracting officer's Best Value Decision also noted that, for [ ], she found "very little difference for this factor, despite the different rating provided by the TEP." AR 3168. She supported this statement with "the fact that [ ] resulted from the [ ]," while the [ ] noted in LB & B's past performance that resulted in a "SATISFACTORY" rating were derived from [ ]. However, "[ ] to our contract, LB & B received very favorable comments, particularly relating to [ ] and [ ]. The references contacted also noted [ ] and [ ] to [ ]." Moreover, the contracting officer expressly noted that LB & B does have some [ ], which pose [ ] to the government. Thus, the contracting officer clearly considered LB & B's [ ] before determining that the two offerors had "very little difference for this factor." She did not unreasonably ignore negative information relating to her evaluation of [ ]; she considered all information, and provided a stated, reasonable basis upon which her conclusion rested. In the end, she found a minimal difference between the offerors' [ ]. Consequently, the "advantage" enjoyed by CESI with respect to said factor that was "offset" by LB & B's "slightly superior" [ ] was slight, at best.

Presented with the foregoing evidence, it seems *highly improbable* that the single deficiency noted with respect to CESI's alleged omission of a key subcontractor for [ ] would have altered either the TEP's analysis or the contracting officer's best-value determination. Moreover, even if CESI's technical standing marginally improved absent the deficiency, it is highly unlikely that this fleeting technical advantage would have provided CESI with a substantial

---

**22.** "Concerns" should be singular. The only deficiency or weakness noted by NARA with respect to CESI's key personnel/subcontractors is the [ ] subcontractor deficiency.

**23.** Both offerors received wholly positive feedback with regard to [ ], which was not re-evaluated.

chance to receive the award in light of LB & B's substantial [ ] plus price advantage. As the natural consequence of these findings, we are constrained to hold that CESI was not prejudiced by agency actions with respect to discussions. Therefore, we find no justifiable grounds upon which to grant the plaintiff's motion for judgment on the administrative record based on this issue.

### D. LB & B's Bait–and–Switch of Key Personnel

With respect to this claim, CESI argues that LB & B has engaged in a systematic bait-and-switch scheme with respect to its utilization proposal of key personnel. The factual predicates for CESI's contentions are as follows: (i) LB & B's requested substitution of [ ] of its [ ] key personnel designations on March 9, 2004 ( [ ] days after it received the first award on February 27, 2004, and [ ] months after the submission of proposals); (ii) LB & B's second substitution of [ ] of its [ ] key personnel designations, done in response to NARA's request for updated key personnel information on July 29, 2004; (iii) the RFP prohibited offerors from key personnel substitutions during the first eighteen (18) months of contract performance, barring unavailability due to death, illness, or termination of employment, and LB & B failed to cite any of these exceptions to the prohibition on substitutions when it made its March 9, 2004 changes; and (iv) LB & B's hiring of CESI's current Project Manager upon receipt of the second award, which CESI claims makes it "clear" that LB & B "never intended" to utilize the person it identified as the Project Manager in its August 5, 2004 designation. P's Mem. in Support of Mot. for J. at 22. Upon these facts, CESI avers that LB & B has clearly engaged in an improper bait-and-switch.

The defendants counter CESI's claims with the following facts: (i) delays in the procurement that were neither the fault of, nor contemplated by, the defendants, owing to the investigation into the taping incident; [24] (ii) [ ] of the [ ] LB & B key personnel designations made by LB & B in its June 9, 2003 proposal were [ ] LB & B employees at that time; (iii) CESI itself substituted [ ] of its [ ] key personnel designations pursuant to NARA's request for updated key personnel information; (iv) LB & B has not requested permission to substitute CESI's current Project Manager in place of the Project Manager that it designated on August 5, 2004; (v) key personnel substitutions are within the contracting officer's authority to grant, without limitation regarding the reason for the proposed substitution; and (vi) the GAO stated that this issue was lacking merit during the May 11, 2004 "outcome prediction" session relative to CESI's first GAO protest, and subsequently dismissed that protest as academic when NARA agreed to take corrective action with respect to re-evaluating Relative Past Performance only.[25]

■ While the parties disagree on whether, under these facts, an improper bait-and-switch has occurred, they appear to agree on the applicable legal standard that the court should apply. Specifically, the elements for evaluating a claim of improper bait-and-switch are:

(1) The awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the pro-

---

24. *See,* Part II, *supra,* for discussion of the investigation into the taping incident.

25. NARA also notes that the RFP only required three (3) key personnel positions, although offerors were permitted to designate other positions as key personnel positions, and designate personnel accordingly (which is why CESI made [ ] designations, while LB & B [ ] made [ ] designations). Thus, NARA asserts that "[n]othing in the RFP...requires offerors to indicate that they have firm commitments

from their designated key personnel." D's Mem. in Support of Mot. for J. at 26–27. *All* key personnel designations were evaluated by the TEP as part of T1.2—Staffing, however. Thus, the technical evaluation of each offeror was based on all the designated key personnel. As a consequence, if we accept the government's contention, NARA would be in the position of evaluating offerors' capabilities based on unreliable information subject to significant fluctuation.

posal would not be available to perform the contract work; and (4) personnel other than those proposed are [or will be] performing the services.

*OAO Corp. v. United States,* 49 Fed.Cl. 478, 481 (2001).

■ The facts recited, *supra,* unequivocally establish elements 1, 2, and 4, as outlined above; no party contends otherwise. LB & B argues that element 3—*foreseeability* that proposed personnel would not be available to perform the work—should be read to require that the offeror *intentionally* named individuals that it knew were unavailable at the time the offeror made the representation. *See, e.g.,* Int. Mem. in Support of Mot. for J. at 24–25. In contrast, both CESI and NARA agree that the appropriate standard is whether an offeror negligently or knowingly proposed individuals that would not be available to perform the contract. We conclude that CESI and NARA are correct, specifically, that "negligence" is the minimum level of knowledge necessary to establish the third element of an improper bait-and-switch.

■ We begin our analysis of the facts by addressing CESI's contention that LB & B's failure to cite one of the three permissible exceptions (death, illness, or termination of employment) when it sought to make its March 9, 2004 staffing substitutions. CESI appears to imply that NARA's acquiescence to the change, absent invocation of a permissible exception, was, *ipso facto,* bait-and-switch. We fail to see how failure to invoke a permissible exception equates to negligent representation of proposed personnel. Moreover, we also note that the key personnel provisions state, in addition, that "[i]f key personnel, *for whatever reason,* become unavailable for work under this contract for a continuous period exceeding thirty (30) working days, or are expected to devote substantially less effort to the work than indicated in its proposal, the Contractor shall propose a substitution..." AR 60 (emphasis added). Thus, it appears that the contractor has more flexibility respecting key personnel than CESI indicates, subject to the contracting officer's "evaluat[tion][ ][of] requests for substitution and addition of personnel" regarding which he shall "promptly notify the Contractor, in writing, whether a request is approved or disapproved." *Id.* We read these clauses together, as we must, and hold that changes to key personnel may be made for any reason, subject to the contracting officer's approval, and in conformance with the additional requirement that "proposed substitutes (no matter when they are proposed during the performance period) shall have qualifications that are equal to or higher than the qualifications of the person being replaced." *Id.* Thus, NARA's acceptance of the substituted personnel, absent an affirmative statement setting forth one of the three stated exceptions to the substitution rule, was not improper.

■ CESI also contends that the fact that LB & B substituted [ ] of its [ ] key personnel designees a short eleven (11) days after it received the first award decision provides adequate circumstantial evidence that LB & B could not have reasonably foreseen the availability of its initial designees. Additionally, CESI urges us to consider, as additional circumstantial evidence of LB & B's ongoing bait-and-switch scheme, LB & B's second substitution of [ ] of its [ ] designees in response to NARA's request for key personnel updates. In this regard, CESI cites *Planning Research Corp. v. United States,* 971 F.2d 736 (Fed.Cir.1992), for the proposition that it is reasonable "to conclude that awardee's post-award changes to key personnel constituted circumstantial evidence that awardee never intended to utilize key personnel listed in its proposal." P's Mem. in Support of Mot. for J. at 23. Even the most cursory reading of *Planning,* undertaken by one not learned in the law, reveals both the inapplicability of *Planning* to the facts at hand and CESI's apparent mischaracterization of the holding therein.

In *Planning,* the offeror (PRC) was required to propose nineteen (19) key and eighty-two (82) non-key personnel who were to be committed to the contract for no less than one year. *Planning,* 971 F.2d at 737. The solicitation heavily emphasized that the contract required a stable, qualified work force in order to prevent delays to the contract work. *Id.* The offeror sub-

mitted resumes of the requisite 101 persons by retrieving the resumes off of an employee database it maintained. *Id.* at 738. Further, the offeror divulged in its proposal that " 'immediately upon contract award, PRC will obtain a roster of incumbent employees and begin recruiting efforts' and that it 'estimate[d] that a high percentage of incumbent personnel at EAI [the incumbent contractor's personnel working at the agency] will be available to join PRC.' " *Id.* When PRC was told that those sentiments, if true, seriously weakened its proposal, it "repeatedly assured [the agency][ ] both orally and in writing that incumbent personnel would not be required and that *the people named in its proposal would be the actual ones who would perform the contract.*" *Id.* (emphasis added). Ultimately, the Board of Contract Appeals found that:

> [W]ith the exception of the project director and one or two other key personnel, PRC had not contacted the people who had been proposed, or their supervisors, to determine their availability to work on the [ ] contract at the time of submitting its best and final offer (BAFO). Moreover, at about the time PRC's BAFO was submitted, a senior personnel manager sent a memorandum regarding the [ ] contract to PRC's vice president in charge of the procurement stating that:
>
> > [b]ased upon the assumptions that relatively few internal candidates will actually be assigned to the effort and few of the incumbents will join PRC, I am anticipating that we will have to hire in excess of 50 people over the next two months.

*Id.*

Faced with the overwhelming evidence cited above, in addition to evidence of extensive substitutions after performance began, the Board of Contract Appeals held that PRC had engaged in an unlawful bait-and-switch. *Id.* at 739. The Federal Circuit, adopting the factual findings of the Board, affirmed the Board's decision with respect to the claim of bait-and-switch. *Id.* at 743.

As we noted, this court fails to see the applicability of *Planning* to the facts in the case at bar. Furthermore, with respect to

CESI's specific factual allegations (which are not contested), we find that the nine (9) month period of time between LB & B's initial proposal and its first substituted changes militates against finding that LB & B negligently proposed personnel that were ultimately unavailable. Also, we note additional support for this finding based on the fact that [ ] of LB & B's [ ] originally-proposed key personnel were [ ] at the time of their designation.

CESI's argument that LB & B's second key personnel substitutions ([ ] of [ ] key personnel designees), which occurred as a result of NARA's request for updated key personnel information, support a finding of improper bait-and-switch is similarly unavailing. Again, CESI's first and second GAO protest, and the corrective action taken in response to the first protest, caused an additional five (5) month period to elapse prior to the second substitution. Thus, we likewise find that the passage of time undermines the likelihood that LB & B negligently proposed personnel that it should have known would be unable to perform the contract. Additionally, CESI itself took full advantage of the opportunity to update its proposal with respect to key personnel, substituting[ ] of [ ] designees. That fact also wholly undermines CESI's assertion that NARA improperly favored LB & B in permitting the July 29, 2004 updates to key personnel designations, because CESI equally benefitted from the revision. Moreover, CESI's substitutions further substantiate our finding that the passage of time affected the availability of key personnel.

Lastly, we note that "it is neither unusual or (sic) inherently improper for an awardee to recruit and hire personnel employed by an incumbent contractor." *A.B. Dick Co.,* B–233142, Jan. 31, 1989, 89–1 CPD ¶ 106, 1989 WL 240388, at *4, 1989 U.S. Comp. Gen. LEXIS 241, at *9 (citing *Applications Research Corp.,* B–230097, May 25, 1988, 88–1 CPD ¶ 499, 1988 WL 227169, 1988 U.S. Comp. Gen. LEXIS 549). Thus, CESI's bare allegations that LB & B has hired some of its staff is in and of itself insufficient to find an improper bait-and-switch. This is especially

so because CESI points to no probative evidence (other than the hiring itself) that indicates said new hires have been, or will be, substituted in the stead of LB & B's current key personnel designees.

In sum, neither the substitutions themselves, nor LB & B's hiring of current CESI staff, evince adequate proof that LB & B negligently proposed personnel that it should have known would be unable to perform the contract work. In light of the unforeseen procurement delays, wrought largely from investigations into CESI's potential procurement integrity violation and CESI's two prior bid protests, we are not convinced that LB & B knew, or should have known, that it would be unable to produce its key personnel designees when LB & B proposed them. Thus, we hold that CESI's claim that LB & B engaged in an improper bait-and-switch scheme with respect to its key personnel is not a valid basis upon which to grant its motion for judgment.

### E. NARA's Evaluation of Offerors' Price Proposals

Regarding CESI's contention that NARA did not reasonably evaluate the offerors' price proposals, CESI states that (i) NARA "failed to adequately evaluate price/cost and the offerors' cost proposals before making its best value tradeoff and award decision," and (ii) "failed to recognize that LB & B may not have proposed the RFP-required collective bargaining agreement ('CBA') rate for the base and option years of the contract." P's Mem. in Support of Mot. for J. at 24.

With respect to CESI's first claim that NARA failed to evaluate "cost," we note at the outset that CESI's argument suffers from the logical fallacy of equivocation. In other words, CESI continually attempts to assert "cost analysis" interchangeably with "price analysis." This is extremely misleading, because the Federal Acquisition Regulations draw a highly significant distinction between the two terms. "[W]hen contracting on a firm-fixed-price...basis [as here], com-

parison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed." FAR § 15.305(a)(1). "Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR § 15.404–1(b)(1). Furthermore,

> The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:
>
> > (i) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes price reasonableness....

FAR § 15.404–1(b)(2).

Cost analysis, in contrast:

> [I]s the review and evaluation of the separate cost elements and profit in an offeror's or contractor's proposal (including cost or pricing data information or information other than cost or pricing data), and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency.

FAR § 15.404–1(c)(1).

As we noted, the RFP under review here contemplates the award of a firm-fixed-price contract. CESI argues that NARA evaluated the price proposals by making a simplistic bottom-line comparison among the five (5) proposals it received. Yet, pursuant to FAR § 15.404–1(b)(2), cited above, nothing more is required. Thus, NARA adequately conducted the requisite price analysis "before making its best value tradeoff and award decision." [26] P's Mem. in Support of Mot. for J. at 24.

Plaintiff additionally contends that NARA failed to ensure that LB & B included the applicable CBA rates and Department of Labor wage determinations. In this regard, CESI states that:

**26.** NARA's best-value decision is discussed in the next section. We note here, however, that NARA found that CESI and LB & B were technically equivalent; thus, no tradeoff between price and technical merit was required. In other words, NARA did not "trade" any technical advantage away in order to secure a lower price.

Even if LB & B proposed CBA wage rates, its other proposed cost/pricing appears to be too low because in order to reduce its pricing by so much, LB & B must have removed or proposed unrealistic amounts for overhead, G & A, fringe benefits and/or profit. Any such missing costs create a performance risk that NARA should have recognized and considered as part of its evaluation.

P's Mem. in Support of Mot. for J. at note 12.

 This argument fails for two reasons. First, "[t]he fact that a firm's offer may not include any profit or may be an attempted buy-in does not render the firm ineligible for award. This is so because below-cost pricing is not prohibited and the government cannot withhold an award from a responsible bidder merely because its low offer is below cost." *Family Realty*, B–247772, July 6, 1992, 92–2 CPD ¶ 6, 1992 WL 167007, at *2, 1992 U.S. Comp. Gen. LEXIS 742, at *6–7 (citing *Ebonex, Inc.*, B–213023, May 2, 1984, 84–1 CPD ¶ 495, 1984 WL 44184, 1984 U.S. Comp. Gen. LEXIS 1184; *Norden Sys. Inc.*, B–227106–9, Aug. 11, 1988, 88–2 CPD ¶ 131, 1988 WL 227704, 1988 U.S. Comp. Gen. LEXIS 909). Second, CESI notes that its proposed price represents a "relatively minor" [ ] increase over LB & B's price, P's Mem. in Support of Mot. for J. at 31, and elsewhere notes that, under the current contract, it "bid on the follow-on CFM Contract at issue here to generate a [ ] gross [profit] margin of [ ]. On a contract with approximate annual revenues in excess of $10 million, that amounts to a gross profit of [ ]per contract year." CESI SOF ¶ 130. Thus, by its own admission, it is highly realistic that LB & B *can* perform the contract at its stated price and still earn approximately [ ] per contract year in gross profits.[27] Accordingly, it is unlikely that LB & B proposes to perform the contract at a loss. Consequently, any performance risk[28] associ-

ated with a below-cost offeror is not likely a factor under the present facts.

As we find nothing improper with NARA's evaluation of the offerors' price proposals, we necessarily hold that CESI cannot prevail on the merits of its motion for judgment on the administrative record on this basis.

### F. Agency's Cost/Technical Tradeoff and Best–Value Determination

In the previous sections, we noted that, under this record, NARA did not need to conduct a cost/technical tradeoff, because both CESI and LB & B were viewed as equivalent from a technical standpoint. *See,* Part IV.C.2 and note 24, *supra.* Thus, NARA did not have to concede any technical advantage in order to secure a more favorable price. *SAMS El Segundo, LLC,* B–291620, B291620.2, Feb. 3, 2003, 2003 CPD ¶ 44, 2003 WL 1055212, 2003 U.S. Comp. Gen. LEXIS 30. As a consequence, NARA was reasonable in concluding that the lower-priced offeror (LB & B) presented the best value to the government. CESI once again asks us to address this determination, albeit in a somewhat different context.

CESI's argument respecting this claim is presented as follows: (i) the Source Selection Decision was unreasonable in concluding that LB & B and CESI were technically equivalent; thus, (ii) NARA's best-value determination was improper, as it failed to conduct a cost/technical tradeoff. We evaluate CESI's two-part argument, *seriatim.*

#### 1. Source Selection Decision

Respecting CESI's contention that the Source Selection Decision (SSD) improperly found CESI and LB & B's technical merits to be equal, CESI largely engages in mere bootstrapping of this claim to its argument that it was prejudiced by the [ ] subcontractor deficiency. Without said deficien-

---

**27.** We calculated this figure by multiplying CESI's anticipated gross profits per contract year of [ ] by the number of contract years (5), which equals [ ] (CESI total profit). The approximately [ ] difference between CESI's price and LB & B's price was then subtracted from CESI's total profit, which equals [ ], and represents LB & B's potential total profits over the life of the contract. Dividing

said figure by the number of contract years, we arrive at [ ], which represents LB & B's potential annual gross profits under the contract.

**28.** We note for clarification, any such risk is viewed pursuant to the offeror's responsibility; it is simply not a factor with respect to the agency's price analysis.

cy, CESI argues that it would have received a higher technical evaluation than LB & B. In addition, CESI argues-again-that LB & B's bait-and-switch scheme also caused NARA to improperly evaluate LB & B's [ ] as "slightly superior" to CESI's. This is so, claims plaintiff, because LB & B's strengths with respect to the [ ] subfactor were decisive in reaching the conclusion that LB & B offered a "slightly" superior [ ]. And, the [ ] evaluation was based upon faulty information, due to LB & B's continuing bait-and-switch tactics. Furthermore, CESI argues that "no reasonable evaluator could conclude based on this record, as the CO did here, that CESI had only a 'slight' advantage over LB & B with respect to [ ]." P's Mem. in Support of Mot. for J. at 30.

We previously held that CESI suffered no prejudice with respect to the [ ] deficiency. While the contracting officer noted said deficiency in her SSD, she also cited LB & B's comparative strengths for the relevant subfactor. Moreover, she expressly noted LB & B's strengths with respect to subfactor T1.3—Quality Control. Thus, we cannot concur with CESI's position that the determinative, and only, reason that the contracting officer concluded that LB & B had "slight" advantage regarding factor [ ] was because of [ ] deficiency.

CESI's contention that both the TEP analysis and the contracting officer's SSD was faulty with respect to their evaluation of LB & B regarding T1.2—Staffing because it failed to consider LB & B's allegedly ongoing bait-and-switch scheme is similarly unavailing. As we discussed, *ad nauseum, supra*, we fail to find that LB & B has engaged, or continues to engage, in an improper bait-and-switch, as contended by CESI. Thus, there can be no impropriety in NARA's failure to downgrade LB & B for said alleged bait-and-switch.

Next, we explore CESI's averment that the contracting officer unreasonably determined that, despite different adjectival ratings for factor T3—Relative Past Performance ("[ ]" vs. "[ ]"), LB & B's and CESI's proposals had "very little

difference" with respect to said factor. AR 3168. As we noted, *supra,* the contracting officer's SSD included her analysis of the weight she believed it appropriate to accord LB & B's negative past performance information. Specifically, she found that LB & B's past performance on contracts most similar to the one at bar (which was very positive) was most indicative of how LB & B would perform pursuant to the subject contract. Moreover, she discounted the importance of the [ ] past performance comments LB & B received, because she found it less indicative of how LB & B would perform for NARA. Respecting CESI's past performance, she particularly noted that some [ ] were made with regard to its [ ]. Thus, she found those comments particularly compelling. Accordingly, she reasonably determined that the two offerors' [ ] was more similar than the bare adjectival ratings revealed.

■ "An agency's evaluation of past performance, like the evaluation of other aspects of an offeror's proposal, is a matter within the discretion of the contracting agency and will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations." *SAMS El Segundo,* 2003 CPD ¶ 44, 2003 WL 1055212, at *10, 2003 U.S. Comp. Gen. LEXIS 30, at *26 (citations omitted). Furthermore, the contracting officer's analysis of past performance here was not only reasonable, but also the type of analysis expressly prescribed by the Federal Acquisition Regulations:

> Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevancy of the information, source of the information, context of the date, and general trends in contractor's performance shall be considered.

FAR § 15.305(a)(2)(i).

Thus, we find that the contracting officer's SSD findings in connection to offerors' Relative Past Performance was reasonable.

Lastly, we hold that the contracting officer's SSD was reasonable with respect to her overall conclusion that CESI and LB & B

were technically equivalent. Thus, she was not required to perform a cost/technical tradeoff. Moreover, it is important to note that she did not need to conclude that the proposals were absolutely equivalent. Instead, she needed only to determine that the proposals "were essentially equal as to all noncost factors." *SAMS El Segundo*, 2003 CPD ¶ 44, 2003 WL 1055212, at *15, 2003 U.S. Comp. Gen. LEXIS 30, at *41. So finding, "no cost/technical tradeoff analysis was needed." *Id.*

### 2. Best–Value Determination

Based upon our finding in the immediately-preceding subsection, CESI's contention that the contracting officer's best-value determination was flawed for failure to conduct a cost/technical tradeoff analysis must fail. Therefore, we are obliged to conclude that CESI's allegations with respect to the foregoing fail to provide a basis for a determination on the merits in its favor.

### G. Agency's Decision Not to Amend the RFP

■■ Foremost in connection with CESI's contention that NARA was obligated to amend the RFP to reflect changed requirements, we note that the GAO considered this argument in its second protest,[29] and flatly rejected it. CESI argues that the passage of time has substantially altered the agency's requirements, because: (i) new CBA and area wage determinations issued since initial proposals were submitted; (ii) the renovations to both facilities are now largely complete, therefore offerors' proposals need not be based upon the plans for the renovations, but should be based on the actual state of the facilities as they exist today; and (iii) the RFP contemplated a base year beginning April 1, 2004, and as such, subcontractor and key personnel compensation should be renegotiated to match the new base year, which has yet to be determined. Consequently, CESI claims that the RFP should be amended to reflect the current state of the facilities and the current wages that must be paid, and offerors should be permitted to revise all

aspects of their proposals in light of the RFP amendment. We address each contention *seriatim,* below.

### 1. New CBA and Wage Determinations

As noted, *supra,* the GAO's October 25, 2004 decision addressed this issue. Perhaps mindful of this fact, CESI avoids any mention of the GAO's opinion regarding this issue. Plaintiff points to no legal errors committed by the GAO, nor any new facts that render the GAO's opinion incomplete. Instead, CESI attempts to use *other* "analogous" GAO decisions in support of its claim before this court, while ignoring the GAO decision *under these very facts.* In any event, we shall not overlook the GAO decision, as we are disinclined to "interfere with the executive procurement process where, as here, the . . . [GAO] has made a determination upholding the procurement officials on the merits." *Metric Sys. Corp. v. United States,* 42 Fed.Cl. 306, 311 (1998) (alterations in original) (citations omitted).

In *Consolidated Engineering Services, Inc.,* 2004 WL 2480936, at *5, 2004 U.S. Comp. Gen. LEXIS 225, at *13, the GAO found that "[n]ew CBAs and revised wage determinations may represent material changes such that amendment of the RFP is the proper course of action, unless the record shows that the revised wage determination (or CBA) would not affect the award decision." *Id.* (citing *Fred B. DeBra Co.,* B–250395.2, Dec. 3, 1992, 93–1 CPD ¶ 52 at 14–15). Thus, "there must be some showing that the protester would or could have materially improved its competitive position if the RFP were amended." *Id.* (citing *Northrop Grumman Tech. Servs., Inc.,* B–291506, *et al.; Raytheon Tech. Servs. Co.,* Jan. 14, 2003, 2003 CPD ¶ 25 at 35). CESI argued that, in light of the new CBAs and wage determinations, "it 'very well may make different staffing decisions such as in the number and/or distribution of personnel and labor categories,' without suggesting the types or extent of any staffing changes." *Consolidated Eng'g,* (unredacted decision located at AR

---

**29.** Additionally, CESI's second bid protest complaint is virtually identical to the argument it now makes in its Memorandum in Support of

Plaintiff's Motion for Judgment on the Administrative Record.

2759) (citing CESI Supplemental Comments at 12–13). "In short, CESI's bare claim that it would change its proposal in response to the new CBAs and wage determination, without more fails to meet its burden of demonstrating that it could materially improve its competitive position." *Id.*

As it did before the GAO, CESI still fails to cite any specific evidence of how it could improve its competitive position, armed with updated CBAs and wage determination. The only additional support that we find for CESI's position is its assertion that, "[a]s with any service contract, these developments bear directly on the labor costs—the major cost element of this RFP." P's Mem. in Support of Mot. for J. at 34. We regard this as another "bare statement," and fail to see how new CBAs and wage determination rates provide a basis for CESI to assert that it could "materially improve its chance for award," without some measure of concrete support. This is especially true because the new labor rates affect both CESI and LB & B. Based on the record before us, we cannot see how CESI will materially benefit in any way that LB & B would not also benefit. Consequently, we are persuaded, as was the GAO before us, that a bare assertion that CESI *may* make different staffing choices is simply insufficient to meet its burden. Thus, we are constrained to hold that CESI's motion must be denied with respect to its argument that the RFP should have been amended in light of new CBAs and wage determination rates and that CESI should have been permitted to revise its proposal accordingly.

### 2. Completion of Construction

In connection with its averment regarding renovations, CESI flatly admits that the RFP contemplated the renovations, and provided offerors with NARA's building plans. Nonetheless, CESI argues that, since the renovations are now nearly complete, "the Agency's current requirements are definitized." P's Mem. in Support of Mot. for J. at note 14. Thus, it concludes that offerors should be permitted to revise both their technical and price proposals.

Based upon the foregoing, the GAO noted that "[a]n agency must amend a solicitation to reflect a significant change in the government's requirements, even after the submission of final proposal revisions, up until the time of award." *Consolidated Eng'g,* 2004 CPD ¶ 214, 2004 WL 2480936, at *4, 2004 U.S. Comp. Gen. LEXIS 225, at *12 (citing FAR § 15.206(a); *United Tel. Co. of the Northwest,* B–246977, Apr. 20, 1992, 92–1 CPD ¶ 374 at 7–9, *aff'd, Dept. of Energy et al.,* B–246977.2 *et al.,* July 14, 1992, 92–2 CPD ¶ 20). However, "since the original proposals were to be based on the ultimate completion of the work in question, the agency could reasonably conclude that there was no need to allow offerors to revise this aspect of their proposals." Moreover, "the matters identified by CESI were contemplated by the RFP, and therefore did not constitute significant changes to the requirements." *Id.* Neither the facts, nor CESI's argument with respect thereto, have undergone any transformations since the GAO's October 25, 2004 opinion.

As the GAO opinion made clear, CESI's entire argument with respect to this issue is premised upon its assertion that proposal revisions made now, after the completion of construction, would allow offerors to "be more focused on the Agency's existing requirements." P's Response to Ds' Mots. for J. at 32. Stated another way, CESI argues that "proposals should not be based on speculation as to an agency's precise requirements, especially when those requirements, as here, are definitized in a procurement in which the agency is requesting revised proposals anyway." P's Mem. in Support of Mot. for J at 34. Plaintiff's argument ignores two critical points. First, that NARA's limits on proposal revisions was a reasonable measure to avoid "creation of an auction," since LB & B's price had been revealed. *Consolidated Eng'g,* 2004 CPD ¶ 214, 2004 WL 2480936, at *3, 2004 U.S. Comp. Gen. LEXIS 225, at *9 (citing *Rel–Tek Sys. & Design, Inc.*—Modification of Remedy, B–280463.7, July 1, 1999, 99–2 CPD ¶ 1). And second, the mere availability of more definite information is not a "change in the government's requirements" that warrants revision of the RFP. Thus, the fact that the building plans and written specifications provided to

all offerors by NARA can now be viewed up close and in person does not significantly change the scope or requirements of the contract. As such, the progress of the renovations does not present an adequate basis for requiring RFP revisions.

We find that the GAO's decision with respect to this issue, under unchanged facts, was thoughtful, well-reasoned, and legally sound. Resultantly, we shall not disturb the GAO's prior decision denying this claim.

### 3. Change to the Base Year

The final basis upon which CESI seeks relief is its allegation that the base year for the contract has changed due to the passage of time. Therefore, CESI avers that it must be afforded the opportunity to update its price proposal because "[t]he definition of the base year for the Contract is a key consideration in establishing the financial arrangements with its key personnel and key subcontractors." P's Mem. in Support of Mot. for J at 34. CESI claims that it "calculated such arrangements based on the base year beginning April 1, 2004, as contemplated by the RFP." *Id.* (citing P's SOF ¶ 110).

Once again, we note that the GAO fielded this claim already, and found it wholly without merit. The GAO found that, "the base year was defined in the RFP as the first 12 months of performance-rather than as a period with specified start and end dates-in part, to eliminate the need for amendments in the event of a delay in awarding the contract." *Consolidated, supra* (citing record evidence). We concur. Further, any delays to the anticipated base year "did not change the statement of work, the evaluation scheme, or the length of time for which the contractor would be obligated." *Id.* Again, we find this GAO finding accurate and persuasive. Finally, the GAO noted that "[t]he contracting officer also considered the lack of any change to the number of, or positions identified as, key personnel/subcontractors, in concluding that the requested revisions in those areas would not likely significantly affect price." *Id.* We find nothing unreasonable in the previous statement. Consequently, we again find no reason to disturb the GAO's decision, and adopt its findings as our own. As such, we necessarily deny CESI's motion for judgment on the administrative record upon this basis.

### H. Permanent Injunctive Relief

In order to establish that it is entitled to permanent injunctive relief, the plaintiff must establish actual success on the merits. The foregoing analysis reveals that we find no basis upon which to grant CESI's motion for judgment on the administrative record. As such, CESI has failed to establish an entitlement to injunctive relief, *i.e.*, it has failed to show actual success on the merits. Nonetheless, we shall *very briefly* discuss the remaining elements required for injunctive relief

In addition to actual success on the merits, plaintiffs must make three additional, specific showings, by clear and convincing evidence, to wit: (i) that it will suffer specific irreparable injury absent the relief, (ii) that injunctive relief serves the public interest, and (iii) that the balance of the hardships favors plaintiff. *TRW Environmental Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 72 (1989). Because a permanent injunction is an extraordinary remedy, we stringently review each element. *Id.*

### 1. Specific, Irreparable Injury

CESI alleges that it has suffered irreparable injury because it was deprived of a fair opportunity to compete for the subject contract. Irreparable injury can be shown in the "form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom." *Metcalf Constr. Co., Inc. v. United States*, 53 Fed.Cl. 617, 645 (2002) (citations omitted). Here, however, CESI has failed to establish any basis to claim that it was deprived of a fair opportunity to compete. With respect to lost profits, we note that CESI anticipates gross annual profits of approximately [ ], had it been awarded the contract. Thus, CESI stands to lose a total of [ ] over the life of the five (5) year contract. Unfortunately, because CESI cannot establish that it should be the proper recipient of the contract, it cannot use lost profits to establish irreparable injury.

We note here that, due in large part to CESI's two prior protests (the second of which was determined to be without merit), the taping incident, and its extraction of a stipulation from the parties in this action that they would postpone LB & B's contract commencement date by an additional month to afford this court to rule on the merits, CESI has been able to extend its performance for at least a year beyond its contract completion date.[30] Thus, CESI has already earned in excess of [ ] in gross profits over and above what it was entitled to, under the terms of its previous contract. Hence, the $50,000.00 performance bond posted by CESI in exchange for the parties' agreement to forestall commencing the new contract for an additional month in order to permit this court to immediately address the merits of the protest is a small price to pay, in light of the profits it has already extracted from NARA (and LB & B).

We are mindful that CESI's contract extensions, wrought by its multiple protests, may well have been the driving force behind the protests themselves. Additionally, as we noted at the outset of our discussion, the delay in filing this protest, as cited by the government, may well have been calculated to secure another month of performance. In any event, CESI fails to establish irreparable injury.

### 2. Public Interest

The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. Healthy competition ensures that the costs to the taxpayer will be minimized. Here, however, the integrity of the procurement process was inviolate. Consequently, the public interest would not be served by granting an injunction. Furthermore, we concur with NARA that "issuing injunctive relief would, at best, only serve to require NARA to receive facilities management services from CESI, something that the Government has already determined does not present the best value for the Government. Finally, the public is not served by an incumbent's dilatory tactics in pursuing remedies." D's Mem. in Support of its Mot. for J at 45.

### 3. Balance of Hardships

This element of the test for injunctive relief is perhaps more clearly articulated as requiring the protestor to establish that the irreparable harm it will suffer absent relief outweighs the harm that the enjoined party(ies) will suffer if the injunction is granted. Thus, the appropriate analysis here requires us to weigh CESI's irreparable harm absent relief against LB & B's and NARA's irreparable harm if the injunction is granted. As we determined, *supra*, CESI will not suffer any irreparable harm if it is not granted an injunction. LB & B, however, will continue to forego the opportunity to commence the contract that it rightfully deserves. Additionally, NARA states that, since the contract extensions began many months ago, "[ ]." D's Mem. in Support of its Mot. for J at 44. Hence, based upon these mere cursory findings, it is eminently clear that the balance of hardships fails to support granting CESI injunctive relief.

## V. CONCLUSION

For all of the foregoing reasons, plaintiff's motion for judgment on the administrative record is hereby DENIED, and the defendants' cross-motions for judgment on the administrative record are hereby GRANTED.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

---

**30.** CESI's actual performance extension is closer to sixteen months, owing to the two protests and the significant delay arising from the need to investigate the aforementioned taping incident. Since, however, its first protest had some merit, and NARA implemented corrective action with respect thereto, we do not include that period in our estimate.