WIT ASSOCIATES, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

Metropolitan Van & Storage, Inc.,
Intervening–Defendant.

No. 04–167C.

United States Court of Federal Claims.

Filed under seal: Sept. 17, 2004.

Reissued: Oct. 27, 2004.[1]

---

1. An unredacted version of this opinion was issued under seal on September 17, 2004. The parties were given an opportunity to propose redactions, but no such proposals were made. Accordingly, the opinion essentially is issued in its original form.

Jeffrey Paul Hildebrant, Barton, Baker, et al., McLean, Virginia, for plaintiff.

Thomas D. Dinackus, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant.

Joseph Gilbert Billings, Bowie, Maryland, for intervening-defendant, Metropolitan Van & Storage, Inc.

## OPINION

ALLEGRA, Judge.

This post-award bid protest case is before the court on the parties' cross-motions for judgment on the administrative record. For the reasons that follow, the court **GRANTS** defendant's cross-motion and **DENIES** plaintiff's motion, thereby concluding that no relief is appropriate herein.

## I. FACTUAL BACKGROUND [2]

On August 13, 2003, the Army and the Military Traffic Management Command of the Department of Defense issued Solicitation No. DAMT01–03–R–0025 (the "Solicitation") for storage and traffic management of household goods and unaccompanied baggage belonging to service members and U.S. government employees on the West Coast of the United States. Central to the Solicitation was the need for secure warehouse facilities to store millions of pounds of goods and baggage. The Solicitation sought a single contractor to take over transportation management and provide storage services for the West Coast, replacing an existing system in which multiple vendors had provided those services. The contract was to be awarded for a 22–month base period, followed by the possibility of two one-year, and one six-month, option periods.

The Solicitation specified that proposals would be evaluated on a "best value" basis, according to four criteria: a threshold requirement of Proposal Acceptability, dealing with the "timeliness and completeness" of each proposal, as well as three substantive evaluation categories: Technical Capability, Quality of Past Performance, and Price Reasonableness. As to these factors, the Solicitation specified that Technical Capability and Past Performance were to be given equal weight and that Technical Capability and Past Performance combined would be given "approximately" the same weight as Price Reasonableness. The Technical Capability factor was to be scored on a scale from "Excellent (Very Low Risk)" to "Unsatisfactory (Very High Risk)." It comprised three elements: Facility Proposed, which dealt with "facilities space, safety, and security criteria" for the warehouse facility proposed by each bidder, Inventory Control and Tracking and Tracing, which examined the proposed inventory and tracking systems; and Management Approach, which consisted of "a review of key personnel, the offeror's Quality Control Plan, and management philosophy." Each of these sub-factors was to weigh equally in determining a proposal's overall Technical Capability score. The Solicitation further provided that the contract would be awarded to the bidder "whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered."

By September 17, 2003, the deadline for receiving proposals, the Army had received six proposals in response to the Solicitation, including one from plaintiff and another from

---

**2.** These facts are drawn from the administrative record and the supplement ordered thereto.

Metropolitan Van & Storage (Metropolitan), the eventual awardee.[3] Plaintiff's Technical Capability proposal received a score of "Marginal/High Risk," which, under the terms of the evaluation, indicated the Army's judgment that "based on the information provided, there is *substantial doubt* that the offeror demonstrates an adequate understanding of the services required to meet contract requirements," and that the proposal had "high measurable risk" and "weaknesses." (Emphasis in original). This rating was based on plaintiff's scores on the three Technical Capability sub-factors, all of which were "Marginal." The Army identified a number of "weaknesses" in plaintiff's proposal, among them: (I) its warehouse proposal "failed to submit factual verification" of a binding commitment to obtain a warehouse facility; (ii) its inventory control, tracking, and tracing proposal failed to provide details on specific tracing procedures; (iii) its personnel proposal failed to identify certain key personnel and to provide assurances of its long-term strategy for staffing the West Coast contract; and (iv) its quality control plan did not "address all the performance objectives" specified in the Solicitation and failed to provide details explaining how certain parts of the plan would be accomplished. These weaknesses were evaluated as "risks" to the contracting agency and its clients, contributing to plaintiff's overall score of "Marginal/High Risk."

By comparison, the Army identified few "weaknesses" and "risks" in Metropolitan's Technical Capability proposal. The only flaw identified in Metropolitan's warehouse facility proposal, for example, was the submission of a single incorrect insurance form. In similar vein, the only flaw identified in its personnel and management proposals was the alleged failure to identify an alternate Transportation Operational Personal Property Standard System (TOPPSS) administrator– finding that later proved to be incorrect. The relatively few and minor weaknesses in Metropolitan's proposal led to scores of "Very Good" for the proposed facility and the inventory control proposal, "Excellent" for the personnel, quality control, and manage-

ment proposals, and an overall Technical Capability score of "Very Good/Low Risk."

With respect to the Past Performance portion of its proposal, plaintiff received a score of "Good/Low Risk," based upon its performance in a contract for similar, but not identical, services on the East Coast of the United States. The Army's evaluation of plaintiff's past performance indicated that it had relevant experience with the services to be provided under the contract and exceeded the minimum experience requirements. Performance evaluation questionnaires submitted by three of plaintiff's clients yielded 27 ratings of "Adequate," 34 ratings of "Good," and five ratings of "Excellent." Based on these ratings, and its overall experience, the evaluators concluded that plaintiff's proposal "exceeded some of the minimum performance standards."

Metropolitan received a Past Performance score of "Excellent/Very Low Risk." The Army's evaluation found that Metropolitan had relevant experience with the services to be provided under the contract and noted that its proposal exceeded the minimum experience requirements. Performance evaluation questionnaires submitted by four of Metropolitan's clients yielded nine ratings of "Good" and 180 ratings of "Excellent." Based on these ratings, and its overall experience, the evaluators found that Metropolitan's proposal "clearly surpassed minimum performance standards."

Finally, Metropolitan's proposed price of $6,764,560 was approximately 66 percent higher than the $4,052,586 proposed by plaintiff.

On November 21, 2003, the Army notified the bidders that the contract had been awarded to Metropolitan. Upon receiving this notice, plaintiff requested and was granted a debriefing, which occurred on November 26, 2003. Two days later, on November 28, 2003, plaintiff filed a bid protest action with the General Accounting Office (subsequently renamed the Government Accountability Office (GAO)) alleging errors in the Army's evaluation of its bid. On January 15, 2004,

3. Metropolitan was one of the dozen companies operating under the prior contracts; performance under those contracts, however, differed significantly from the contract at issue.

plaintiff withdrew this protest, explaining that the Army had "provided clarification of critical issues about which WIT had been misinformed" relating to the winning proposal.

Nonetheless, on February 6, 2004, plaintiff filed this action alleging flaws in the terms of the Solicitation itself and in the Army's evaluation of the proposals. Plaintiff seeks, *inter alia,* a permanent injunction to terminate the existing contract with Metropolitan and award it the contract; or, alternatively, to order the Army to resolicit the contract. On February 13, 2004, the court granted a motion to intervene by Metropolitan. The cross-motions at issue were then filed and fully briefed. On May 6, 2004, plaintiff filed a motion to amend its complaint to drop its challenge to the Army's evaluation of the proposals and to proceed only on its claim of flaws in the Solicitation. On May 7, 2004, the court granted that motion at the oral argument on the cross-motions.

## II. DISCUSSION

■ In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *see also* 28 U.S.C. § 1491(b)(4) (2000). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,*

462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see Gulf Group Inc. v. United States,* 56 Fed.Cl. 391, 396 (2003). Accordingly, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). Indeed, a protestor's burden is particularly great where, as here, the procurement is a "best-value" procurement. *See Mangi Envtl. Group, Inc. v. United States,* 47 Fed.Cl. 10, 19 (2000); *see also TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996).

■ It is the burden of the aggrieved offeror to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of America, Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004), *aff'g,* 56 Fed.Cl. 377, 380 (2003).[4] Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)). Finally, because injunctive relief is so drastic in nature, a plain-

---

**4.** In *Banknote,* the Federal Circuit expounded upon these principles, as follows:

> Under the APA standard as applied in … ADRA cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation of procedure." [*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)]. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332–33

(citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice under this second ground, a protester must show that there was a "substantial chance" it would have received the contract award absent the alleged error. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999).

*Banknote Corp.,* 365 F.3d at 1351; *see also Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States,* 39 Fed. Cl. 34, 42 (1997).

tiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America, Inc.,* 56 Fed.Cl. at 380–81; *Seattle Sec. Servs., Inc.,* 45 Fed.Cl. at 566; *cf. Beta Analytics Int'l., Inc. v. United States,* 44 Fed.Cl. 131, 137 n. 10 (1999).

Striving mightily to meet these demanding standards, plaintiff originally made three arguments, *to wit,* that: (I) the Solicitation was unduly restrictive because it effectively required the offerors to possess or control a warehouse at the time offers were submitted; (ii) the Army did not evaluate plaintiff's proposal consistent with the stated evaluation criteria; and (iii) the Army acted in an arbitrary and capricious fashion in evaluating plaintiff's technical proposal. Shortly before oral argument, however, plaintiff filed a motion to amend its complaint to drop count II, essentially abandoning the last two of these arguments. The court granted that motion at oral argument. Accordingly, the court need only address the first of plaintiff's original claims—that the Solicitation was unduly restrictive.

■ As a threshold matter, defendant argues that this court should decline to consider this challenge to the terms of the Solicitation because plaintiff failed to raise this issue prior to the time set for receipt of proposals. This court has previously rejected this argument, which is based not on this court's jurisdictional statutes or rules, but those of the GAO. *See* 4 C.F.R. § 21.2(a)(1) (2003). As this court opined in *Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. 533, 535 (2003):

> [T]his court, with all due respect, fails to see how a GAO rule that self-limits that agency's advisory role constitutes a limit, either legally or prudentially, on this court's exercise of jurisdiction. In this regard, 28 U.S.C. § 1491(b)(1) (2000) explicitly provides that this court shall have bid protest jurisdiction "without regard to whether suit is instituted before or after the contract is awarded." In this court's view, while delay in bringing a protest undoubtedly may be considered in the multi-factored analysis of whether injunctive relief is warranted, absent the application of equitable doctrines such as laches, such delay does not constitute an independent legal ground for rejecting a request for injunctive relief .... Indeed, were this court to rule otherwise, it seemingly would have to apply the entire GAO rule, which includes exceptions to the timeliness requirement for "good cause shown" or if a protest raises "issues of significance." 4 C.F.R. § 21.2©. This court cannot imagine that Congress intended this court's bid protest jurisdiction (or the prudential exercise thereof) to rise or fall on such squishy considerations.

Recent cases have reached a similar conclusion. *See CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 568–69 (2004) ("The Court of Federal Claims ... is not bound by the bid protest timeliness rules of the GAO"); *Dismas Charities, Inc. v. United States,* 61 Fed.Cl. 191, 199 (2004) (same); *Miss. Dept. of Rehab. Servs. v. United States,* 58 Fed.Cl. 371, 372–73 (2003) ("The portion of the Tucker Act, 28 U.S.C. § 1491(b), which grants this Court its jurisdiction over bid protests, does not limit the time in which a protest may be brought.").

For the reasons previously stated, the court rejects this argument anew—simply put, there is no callus bridge between the scion of this court's bid protest regime and the stock of the limitations the GAO has imposed upon itself. Defendant attempts to bridge that gap by claiming that it is not asserting that this court lacks jurisdiction, but that plaintiff's objection to the Solicitation fails to state a claim because it was not timely raised. But, apart from citing cases that all rely, in varying degrees, upon the GAO rule, defendant provides no explanation as to why a claim otherwise within this court's jurisdiction is not legally cognizable on the ground it asserts. In particular, the court rejects defendant's notion that its timeliness rule somehow is a logical extension of the patent ambiguity doctrine. The Federal Circuit has emphasized the narrowness of the latter doctrine, stating that it applies "to contract ambiguities that are judged so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997); *see also P.R.*

*Burke Corp. v. United States,* 47 Fed.Cl. 340, 351–52 (2000) ("the patent ambiguity rule is applied narrowly, because to do otherwise, effectively would relieve the government, as drafter, from bearing the consequences of its poorly stated contracts"); *Nielsen–Dillingham Builders, J.V. v. United States,* 43 Fed. Cl. 5, 10 n. 3 (1999). By comparison, defendant's timeliness rule is expansive and relatively absolute and would thus envelop the narrowly-tailored patent ambiguity rule. While various decisions of this court have adopted defendant's position, *see, e.g., Aerolease Long Beach v. United States,* 31 Fed. Cl. 342, 358, *aff'd,* 39 F.3d 1198 (Fed.Cir. 1994) (table), most of these do so with limited analysis—certainly nothing that addresses the key points raised in opposition above.[5] With all due respect, the court finds the analysis in these cases unpersuasive and adheres to its prior view that the timeliness rule espoused by defendant is, in reality, little more than a shibboleth.

■ Turning to the merits of a plaintiff's protest, we begin with common ground: A solicitation must seek proposals that meet an agency's minimum needs, or else the solicitation represents an undue, improper restriction on competition in violation of 41 U.S.C. § 253a(a). *XTRA Lease, Inc. v. United States,* 50 Fed.Cl. 612, 624 (2001) (citing *SMS Sys. Maint. Services, Inc.,* Comp. Gen. Dec. B–270,816, 96–1 C.P.D. ¶ 212, 1996 WL 207103 (1996)); *Fed. Data Corp. v. Dept. of Justice,* GSBCA No. 12264–P, 94–1 B.C.A. ¶ 26,324, 1993 WL 306145 (1993); *Integrated Sys. Group, Inc. v. Dept. of Navy,* GSBCA No. 12127–P, 93–2 B.C.A. ¶ 25,637, 1992 WL 360143 (1992). "In short," this court has held, "solicitations must have a rational relationship to agency needs, must not be unduly restrictive, and should be written in as nonrestrictive a manner as possible in order to enhance competition and invite innovation." *ABF Freight Sys., Inc.,* 55 Fed.Cl. 392, 395 (2003); *see also XTRA Lease, Inc.,* 50 Fed. Cl. at 624 (citing *Fed. Data Corp.,* 94–1 B.C.A. ¶ 26,324, 1993 WL 306145). It remains, however, that the determination of an agency's minimum needs is a matter within the broad discretion of agency officials, *Input/Output Tech., Inc. v. United States,* 44 Fed.Cl. 65, 72 n. 9 (1999), and not for this court to second guess, *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 672 (1997); *see also Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. 533, 539–40 (2003).[6]

■ In asserting the specifications here were unduly restrictive, plaintiff contends that the Solicitation essentially required that an offeror already possess a warehouse conforming to the requirements for housing the goods in question. In its view, it was otherwise impossible for an offeror to obtain the rights to a warehouse capable of storing up

---

**5.** The earliest case often cited for this proposition, *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 789 (1991), did not apply the GAO rule, either directly or by extension, but instead stated that it was "inapplicable." That opinion merely discussed a GAO decision, *Turner Int'l, Inc.,* Comp. Gen. Dec. B–232,049. 88–2 C.P.D. ¶ 434, 1988 WL 228134 (1988), that, in turn, had relied, in part, upon the GAO rule, citing the latter case only for the proposition that "an offeror runs a great risk if it delays in protesting a decision." *Id.* Other early cases espousing this rule concede that the GAO rule is inapplicable, but embrace "the utility" of that rule without explaining that result in terms of some statutory, regulatory or even common law principle. *See, e.g., Aerolease,* 31 Fed.Cl. at 358. While some cases suggest that this judge-made rule has, until recently, been uniformly applied, in fact, it was soundly rejected in *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 353 (1997), where it was stated that "whatever GAO's internal rules concerning assertions of claims, they cannot bind this court." As further reason for not applying this rule, the court, in *Cubic Applications,* stated—"Bid protesters, contrary to the Government's argument, are not protecting merely their own interests in challenging illegal procurement activity. The public has an interest at stake as well, and the courts have recognized that protesters serve, in some respects, as private attorneys general." *Id.* Of course, in some cases, serious delay in raising a claim may impact the equities in determining whether an injunction should issue or lead to the imposition of laches. Unlike the extension of the GAO timeliness rule espoused by defendant, however, such theories require some showing of prejudice. *See Software Testing,* 58 Fed.Cl. at 535–36.

**6.** Plaintiff contends that the burden is on the Army to demonstrate that the specification is reasonably necessary. *Per contra.* The burden decidedly is upon the plaintiff to demonstrate that the judgments rendered by the Army in this regard are arbitrary and capricious. *See Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 231 (1997).

to 15 million pounds of household goods, ensure that facility had fire walls separating every 3 million pounds of storage, and receive the necessary certifications from fire officials all within the 35 days between the issuance of the Solicitation and the date for receiving proposals. The effect of this, plaintiff asseverates, is that the Solicitation favored one of the incumbents, Metropolitan, who already had such a facility. This conclusion seems tenable, at first, until one realizes that its factual premises are faulty.

First, the Solicitation did not require an offeror to have actual possession or control of a compliant warehouse at the time it submitted its offer. Regarding the "Contractor Provided Storage Facility," it prescribed–

> The Contractor shall provide a storage facility(s), which will afford proper protection to the property to be stored ... and also provide firewall separation for every three (3) million gross pounds of stored [household goods]. The contractor shall have [sic] warehouse layout diagram that has been signed and dated by the local fire official.... The Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds.

Amplifying this language, the Solicitation twice indicated, in describing the submittals and then the evaluation factors, that "[i]f the proposed facility is not owned by the offeror, the offeror must submit a lease agreement or some other documentation showing that the offeror will have access to the facility in the event the offeror's firm is awarded the contract." This requirement was applied as written because several offerors, including plaintiff, did not own or have a lease of a qualifying warehouse at the time their proposals were submitted, yet their proposals were deemed to be responsive. Indeed, two of these offerors received a higher rating than plaintiff on this requirement because, they, unlike plaintiff, provided a more definitive indication of their ability to obtain the required warehouse.

Second, plaintiff wrongly contends that having advance possession or control of a

warehouse was *sub silentio* required because that was the only way an offeror could provide a "warehouse layout diagram signed and dated by a local fire official." Nothing in the administrative record supports this assertion and, indeed, at oral argument, plaintiff's counsel admitted that "there are no words to that effect" in the Solicitation.[7] Nor does the record support plaintiff's claim that the fire walls actually had to be in place in order to obtain the appropriate fire certification and meet the requirements of the Solicitation. Rather, consistent with defendant's interpretation, the Solicitation appears to provide only that the fire walls be in place to separate each 3 million pounds of stored goods as those goods accumulated over time (at an estimated rate of 840,000 pounds per month). Plaintiff originally interpreted the language exactly in this fashion, as it indicated in its offer that, as to its proposed warehouse, "additional firewalls will be installed prior to exceeding 3 Million pounds in storage." Moreover, any notion that the fire walls had to be in place in order to obtain the fire certification is also belied by the fact that at least one offeror (Pasha Freight Systems) met this requirement even though it did not possess or control a warehouse with fire walls at the time it made its submission. In fact, plaintiff's proposal was not downgraded due to the failure of having fire walls installed at the facility it proposed, but because there was no indication that it had a commitment that would lead to its obtaining any warehouse.

Third, plaintiff actually had more than 35 days within which to comply with these requirements. In fact, a summary of the Solicitation, revealing the need for a warehouse, was made available on June 5, 2003, 105 days before the due date for proposals. While the warehouse requirements in the summary differed somewhat from those eventually set forth in the Solicitation, the two were similar enough to put plaintiff on notice that it needed to begin the process of lining up warehouse space. In the court's view, this cinch-

---

7. At oral argument, plaintiff admitted that it had made no attempt to supplement the record to support this and other naked factual assertions it made in claiming that the requirements here were unreasonable.

es the conclusion that the requirements here were not unreasonable.

Finally, assuming *arguendo* that the warehouse requirement was unduly restrictive, it remains that plaintiff's proposal was not deemed unresponsive on this point, but merely received a lower rating than it might otherwise. Plaintiff can hardly argue that this alleged error was prejudicial given the series of marginal ratings it received on other key aspects of its proposal: inventory control and tracking and tracing; key personnel; quality control; and management approach. Although plaintiff initially challenged these evaluations, it later abandoned those claims. As such, even assuming that plaintiff has correctly construed the warehouse requirement—which it has not—it has failed to show that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that [it] would have been awarded the contract." *Data General Corp.*, 78 F.3d at 1562; *see also Maintenance Eng's v. United States*, 50 Fed.Cl. 399, 426 (2001) (assuming *arguendo* agency's evaluation of factor was defective, no prejudice as other low ratings made the award of a contract unlikely).

## III. CONCLUSION

This court need go no further. Measured by the appropriate standard of review, the Army's conduct here was neither erroneous nor prejudicial to plaintiff. The injunctive relief requested by plaintiff, therefore, is inappropriate.

In consideration of the above, **IT IS OR-DERED:**

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED**.

2. This opinion shall be published as issued after October 15, 2004, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.