**ARGENCORD MACH. & EQUIP., INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 05–731C.

United States Court of Federal Claims.

Filed Under Seal Sept. 30, 2005 [1].

Reissued: Oct. 7, 2005.

No redactions having been received, the Court publishes this opinion *in toto*.

Gary Marcus and Mitchell Reiter, Goldberg & Connolly, Rockville Centre, New York, for Plaintiff.

Tara K. Hogan, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., Marcia E. Stevens, Office of General Counsel, U.S. Army Aviation and Missile Command, Redstone Arsenal, Alabama, for Defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND DENYING PLAINTIFF'S MOTION FOR A PERMANENT INJUNCTION

WILLIAMS, Judge.

In this post-award bid protest, Plaintiff, Argencord Machinery & Equipment, Inc. (Argencord), challenges the Army's award of a contract to Tek Precision Company (Tek) for tie rod structural support assemblies for Black Hawk helicopters.[2] Plaintiff alleges that the Army improperly rejected its amended proposal because its initial proposal had been late. In addition, Plaintiff contends that the amendment, which allowed offerors to propose "machined" rather than "forged" tie rods, was so substantial as to warrant the cancellation of the solicitation and a resolicitation.

This matter comes before the court on Plaintiff's motion for a permanent injunction and Defendant's motion for judgment upon the Administrative Record (AR). Although the Army erred in accepting Plaintiff's late initial offer and inviting a revised proposal, these errors do not warrant enjoining the award to Tek and directing award to Plaintiff.[3] Rather, the Army properly rejected

---

2. Plaintiff initially protested this award at the Government Accountability Office (GAO). GAO dismissed the protest as untimely without addressing the merits of Plaintiff's claims. AR at 1.

3. While these errors could have caused Plaintiff to expend costs responding to an amendment it never should have received, Plaintiff's Operations Manager testified that Plaintiff's three-page response to the Amendment only took five minutes

Plaintiff's amended proposal once it determined Plaintiff's initial offer should have been rejected as late. Further, Plaintiff failed to establish that the Army was required to cancel the solicitation and resolicit when it permitted offerors to propose alternate material including machined tie rods. This relaxation of the requirement was not so substantial as to exceed what prospective offerors reasonably could have anticipated and thus did not warrant reopening the competition. As such, Plaintiff's motion for a permanent injunction is denied, and judgment on the Administrative Record is entered for Defendant.

### Findings of Fact [4]

#### The Solicitation

On July 6, 2004, the United States Army Aviation & Missile Command at Redstone Arsenal, Alabama (Army) issued solicitation number W58RGZ–04–R–0164 for the acquisition of tie rod structural support assemblies for Black Hawk helicopters. AR at 75. The procurement was a small business set-aside, and was to result in an indefinite delivery indefinite quantity (IDIQ) contract with a minimum quantity of 406 and a maximum of 2406 over a five-year period. AR at 66, 75. Because the tie rod structural supports were categorized as "critical safety items," only contractors capable of becoming source-approved by the Army before the date of award were eligible. FAR 209.270–4, 48 C.F.R. § 209.270–4 (2004); AR at 73.[5] The solicitation required that the tie rods be made through a forging process. Dantona Aff. ¶ 10, Ex. D.

The Army sent the solicitation to eight potential offerors. AR at 290. The deadline for the receipt of offers was 4:00 p.m. on

August 12, 2004. AR at 72. Award was to be made to the low responsive offer.

#### Initial Offers

The Army received offers from four entities, Plaintiff, Tek, CPI Aerostructures, Inc. (CPI), and Logistical Support, Inc. (Logistical Support). AR at 290. Both Plaintiff and Tek were pre-approved sources, whereas CPI and Logistical Support had not yet undergone engineering testing for source approval. AR at 290. After realizing that CPI and Logistical Support could not receive source approval in time for award, the Army determined that they could not be considered for award. AR at 290.

Tek offered a price of $569 per unit for the first year—with or without a First Article Test Requirement (FATR)—$569 per unit for the second year, $579 per unit for the third year, and $598 per unit for the fourth and fifth years. AR at 146. In addition, Tek's offer included a request "for approval to allow use [of] an alternate material"—a "machined" tie rod. AR at 154. Tek supplemented its proposal by attaching a Request for Waiver, DD Form 1694, which documented the Army's approval of the machined material under a prior contract based upon Tek's showing that such alternate material had passed testing requirements. AR at 204–05.

In its offer, Argencord proposed a price of $547 per unit for the first two years, $574 per unit for the third year, $603 per unit for the fourth year and $633 per unit for the fifth year. AR at 211–16. Argencord also requested waiver of first article testing and offered a price of $535 per unit for the first year without such testing. AR at 211–13.

Plaintiff transmitted the first 13 pages of its offer via facsimile transmission (fax) on August 18, 2004—six days late—and stated

---

to prepare and Plaintiff did not change its pricing. Tr. at 41.

4. These findings are derived from the Stipulation of Facts, the AR, the record of the evidentiary hearing on Plaintiff's motion for a permanent injunction held in New York City on July 20, 2005, and the supplements to the AR filed on August 1, 2005.

5. The tie rod assemblies which hold the helicopter's transmission in place are flight critical

parts. Tr. at 13. To gain source approval, any potential contractor was required to submit a manufacturing plan that detailed how the structural support would be fabricated. AR at 87. If the Army found the contractor's plan acceptable, the part would undergo engineering testing. If the part passed the required tests, the Army would approve that potential contractor's manufacturing plan and designate the manufacturing plan "frozen"—meaning that no changes could be made to critical processes without first receiving Army approval. AR at 87.

that its entire proposal was being sent via Federal Express for delivery the following morning. AR at 206, 290; Tr. at 72.[6] On the fax cover sheet Plaintiff stated: "We were under the false impression that the solicitation was due on August 29, 2004, which was listed on the June 24 solicitation notice." AR at 206.[7]

The contract specialist explained why he evaluated Argencord's late initial offer:

Q.: When you opened and evaluated Argencord's initial offer, did you know it was late?

A.: Yes.

Q.: Why did you go forward and evaluate it?

A.: Well, I received a fax and placed it in the file. I didn't actually evaluate it at that time. And when I did evaluate the proposals because it was—I didn't catch that it was late because it had the correct date on the bottom or something. The time frame had been an extended amount of time and I was working on multiple items. It was the November time frame as opposed to the August time frame when I got around to doing the evaluation.

Tr. at 216–17.[8]

*Amendment 1*

On September 23, 2004, the Army issued Amendment 1 to the solicitation to the four offerors who had submitted initial proposals—Plaintiff, Tek, CPI, and Logistical Support. AR at 221; Tr. at 111. The Amendment authorized progress payments and notified all the offerors that a technical request to use alternate material had been received. AR at 222. The Amendment further stated: "Alternate material may be authorized upon award if substantiating documentation that the alternate material has passed Army Fatigue test require-

ments is provided with response to this amended solicitation." AR at 222. The Amendment also gave the offerors until October 15, 2004, to revise their pricing. AR at 222.

The alternate material which Tek sought to supply was a machined tie rod which differed from the originally-required forged tie rod in its manufacturing process. Tr. at 24–25. Under the forging process, a piece of aluminum is heated and pressed into a large irregular-shaped mold and "it oozes into a shape ... like a piece of clay ...." Tr. at 26–30. There is only one approved source for the raw forged part—Consolidated Industries (Consolidated). Tr. at 35–36. The raw forged tie rod, which Consolidated supplies to Argencord, costs $172. Tr. at 36. According to Plaintiff's Operations manager, a raw piece of aluminum for the machined tie rod costs between $30 and $50. Tr. at 36.

In the alternate machining process, the tie rod is cut from a rectangular "raw bar stock piece of aluminum." Tr. at 34–35. This process entails "cutting a lot of metal without precision," whereas forging entails more precision machining. Tr. at 35–36. Plaintiff's Operations Manager further explained the difference in the fabrication process for the forged and machined parts:

Q.: Once the part is forged, once the part is machined, can you describe and compare the differences between the rest of the manufacturing process that needs to be done to get each part to a final part?

A.: There are certain dimensions that the forging is very strong but they can't do detail so the forging comes somewhat as you see it, there is more metal attached to it. And we are required to machine those pieces off. The hard part of this is this is a very irregular shaped item and it is a very critical

---

6. The Army claims it only received the first 13 pages of Argencord's offer because it has no record of Argencord's full offer. Def.'s Mot. For Judgment on the AR at 4. However, the evidence on this is inconclusive, and the Army evaluated Argencord's offer and determined it to be in the competitive range before realizing its initial offer had been late. AR at 265–66.

7. According to the synopsis of this requirement posted on the Federal Business Opportunities website, August 29, 2004, was the date the solicitation notice would be removed from the website and archived. AR at 64.

8. This colloquy was between the court and the witness.

item. It's a safety critical item and there are certain dimensions on that part that the manufacturer has declared that those dimensions cannot move. Those dimensions are true points, tool points. And because the part is forged, the forger has determined where those tool points are. Me, as the machinist, I have to find those tool points, mount that part in my machine, constantly being aware of where those exact points are. In comparison, when we use a block of metal, we basically can just put it in the machine and now we are making the tool points. We are making those exact points. We don't have to pick up somebody else's point, we are making the point. One of the hardest things a machinist can do is pick up work after somebody else has already touched it because they have already set in stone how it is to be made, so you have to do what they did. When you start with a blank block of aluminum, you decide how to make it and it's much easier.

Tr. at 26–27.

The lead time for obtaining forged parts from Consolidated was approximately 14–16 weeks, while obtaining raw stock would take six or seven weeks. Tr. at 37. It would take Argencord six months to supply the forged part, and 18 weeks to supply the machined part. Tr. at 38–39, 69–70.[9] The time for manufacturing the forged and machined tie rods was identical. Tr. at 38. Both processes also entailed finishing the surface—coating, inspection, shot peening,[10] bonding and painting which takes approximately another 10 weeks. Tr. at 30–34, 37–39.

*Offers in Response to Amendment 1*

On October 15, 2004, Plaintiff submitted its response to the Amendment noting it would not request use of the alternate material, but instead would use forging if "favored with the contract." AR at 260. Tek's response to the Amendment indicated that it would use the alternate material. AR at 254. After evaluating the offers, the Army determined that Plaintiff offered the lower price for the first-year unit price. AR at 264.

At some point after opening the offers received in response to the Amendment, the contracting officer first discovered that Plaintiff's initial proposal had been submitted late. AR at 279; Tr. at 132. The contracting officer explained that she was concerned with the Government's untimeliness and that this caused her to consider initiating a new procurement rather than potentially exercising an option. Tr. at 167–68. She testified:

Q.: Let's take a look at . . . the determination and findings. The last sentence of that states, "It is within the government's discretion to initiate a new procurement for requirements." Why did you write that?

A.: Because at the time I was struggling with the late proposal and I didn't know how that would play out. I was concerned because of the government's untimeliness and I didn't know that it would come back to haunt us if my decision didn't hold up that he was, indeed, late. That this might be a means to where we could go back and recompete it or at least give him the opportunity to bid on future requirements. My biggest [thing] was that we were so untimely in our getting back to him and that was really the basis of my whole decision. I know that we were not timely, and it looks bad on our part, and that's why I kind of drilled my legal person to be sure that there is nothing out there that would overturn this decision. I wanted to be sure that I am going to do the right thing when I make this call. So that's what was driving me to do all of the background checking and all of the questions because I knew that we had boo-booed.

Q.: In what respect had you boo-booed?

9. In his affidavit in support of Plaintiff's motion for preliminary injunction, Plaintiff's Operations Manager testified that it would take Argencord nine months to supply the forged part. Tr. at 69; Dantona Aff. (July 5, 2005) ¶ 31.

10. "Shot peening is a surface treatment which makes the surface tougher to fatigue and stress cracks. The part is basically blasted with ball bearings . . . ." Tr. at 32.

A.: Because we were untimely in our response. We were untimely in our response and we had treated the contractor as if he were successful offeror until the point I found out his bid was late, which should have never happened, but it did. And so . . .

. . . .

That was another rookie mistake is what I call it. Just a rookie mistake.

Tr. at 167–69.[11]

By letter dated January 6, 2005, the Army notified Plaintiff that because its original offer was late and had been submitted by fax, which was not authorized, its proposal could not be considered. AR at 291.

### Award

On April 26, 2005, the Army awarded contract number W58RGZ–05–D–0126 (the Contract) to Tek, at a unit price of $569.00 for the first year of the procurement, which was $22.00 more than Argencord's first-year unit price of $547.00. Based on the substantiating documentation submitted by Tek that its alternate material met Army testing, Tek was approved to use the alternate material without a reduction in price. By letter dated May 19, 2005, the Army informed Plaintiff that the Contract had been awarded to Tek.

### Discussion

### Jurisdiction and Standard of Review

The court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). In a bid protest, the court reviews the defendant's decision under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn an agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

In order to meet this standard, "the protestor must show by a preponderance of the evidence that the agency's actions were ei-

ther without a reasonable basis or in violation of applicable procurement law." *Gentex Corp. v. United States,* 58 Fed.Cl. 634, 648 (Fed.Cl.2003) (quoting *Info., Tech. and Applications Corp. v. United States,* 51 Fed.Cl. 340 (2001) (ITAC), *aff'd,* 316 F.3d 1312 (Fed. Cir.2003) (internal citation omitted)). "To prevail, the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (citing *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1556 (Fed.Cir.1995)).

The court's assessment of the legality of the agency's procurement decision is to be based upon the Administrative Record unless the court determines that supplementation is warranted. *See generally, Int'l Resource Recovery, Inc. v. United States,* 59 Fed.Cl. 537, 541 (2004). The United States Court of Appeals for the Federal Circuit has recently clarified that in resolving bid protests pursuant to Rule 56.1 of the RCFC, the trial court is to make findings of fact and weigh the evidence in the AR rather than to ascertain whether the absence of a genuine material fact warrants the entry of summary judgment. *Bannum Inc. v. United States,* 404 F.3d 1346, 1355 (Fed.Cir.2005).[12] In order to determine whether the requisites for injunctive relief are present, the court may also conduct an evidentiary hearing. *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004); RCFC 65(a)(2).

### Injunctive Relief is Not Warranted

In deciding whether a permanent injunction should issue, a court considers: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed. Cir.2004).

---

**11.** This colloquy was between the witness and the court.

**12.** In *Bannum,* 404 F.3d at 1355, our appellate authority held that RCFC 56.1 "requires the Court of Federal Claims when making a preju-

dice analysis [in a bid protest] in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record."

*Plaintiff Failed to Succeed on the Merits of its Case*

 The requirement that offerors submit their proposals on time is a "strict rule with very limited exceptions." John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 786 (3d ed.1998); *see also Hosp. Klean of Tex., Inc. v. United States*, 65 Fed.Cl. 618 (2005) (granting temporary restraining order where there was likelihood that agency had awarded contract to offeror whose proposal was late); *Conscoop v. United States*, 62 Fed.Cl. 219, 236 (2004) (finding that the agency properly rejected plaintiff's price proposal as untimely because it did not fall within any of the enumerated FAR exceptions). The late bid rule "may seem harsh, [but] it alleviates confusion, ensures equal treatment of all offerors, and prevents one offeror from obtaining a competitive advantage that may accrue where an offeror is permitted to submit a proposal later than the deadline set for all competitors." *PMTech, Inc.*, B–291082, 2002 CPD ¶ 172 at 2; *see also Zebra Techs. Int'l, LLC*, B–296135.2, B–296230.2, 2005 CPD ¶ 120. While the Government may lose the benefit of the special skills and experience of a late submission, "protecting the integrity of the competitive procurement process by ensuring fair and equal treatment among competitors is of greater importance than the possible advantage to be gained by considering a late submission . . . ." *Zebra Techs. Int'l.* at 2; *see also Inland Serv. Corp., Inc.*, B–252947, B–252947.4, 93–2 CPD ¶ 266 at 2–3.

There is no dispute that Plaintiff's initial offer was late.[13] The only exceptions permitting acceptance of a late bid are found in FAR 15.208(b)(1), which provides:

> Any proposal, modification, or revision, that is received at the designated Government office after the exact time specified for receipt of proposals is "late" and will not be considered unless it is received before award is made, the contracting officer determines that accepting the late proposal would not unduly delay the acquisition; and—

> (i) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

> (ii) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of proposals and was under the Government's control prior to the time set for receipt of proposals; or

> (iii) It was the only proposal received.

48 C.F.R. § 15.208(b)(1).

Plaintiff contends that its late offer met the third exception because it was the only responsive proposal received. By the time the Army received Plaintiff's late proposal, the Army had received three other timely offers. Plaintiff contends that two offers lacking source approval, as well as Tek's offer suggesting an alternate material, should have been deemed nonresponsive and not been considered, leaving Plaintiff as the sole "responsive" offeror. However, the offers of CPI and Logistical Support were capable of being evaluated to ascertain whether they could meet the source approval requirements by the time of award. FAR § 209.270–4(b)(2) (requiring the head of the design control activity to determine whether product can meet standards before award).

Further, the CO was not required to reject Tek's offer out of hand and accept Plaintiff's late offer simply because Tek proposed a deviation. Rather, another FAR provision is implicated here which bears on the reasonableness of the Army's action. Under FAR 15.206(d), the Army had the right to amend the solicitation to permit other offerors to propose the same deviation that Tek proposed—an alternate material which met testing requirements in lieu of forged tie rods. FAR 15.206(d) provides: "If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing

---

**13.** Plaintiff's Operations Manager admitted that he mistakenly thought the due date was August 29, 2004. At the time he submitted Argencord's proposal on August 18, he realized the due date, August 12, had already passed. Tr. at 72; AR at 290.

to the other offerors the alternate solution proposed or any other information that is entitled to protection." 48 C.F.R. § 15.206(d)(2004); *see also Simmonds Precision Prods., Inc.,* B–244559, B–244559.3, 93–1 CPD ¶ 483 (upon receipt of offer with more attractive terms than required by RFP, the Government properly gave other offerors opportunity to submit revised offers); *see generally,* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* at 781 (3d ed.1998) ("If an offeror submits an alternate offer that deviates from the requirements of the RFP, the Government may not award to that offeror but must revise the RFP to permit other offerors to propose to the deviation."). As such, the Army was permitted to give all offerors the same opportunity to propose an alternate material which met its testing requirements.

### Amendment 1 Did Not Extend the Time to Submit Proposals

■ Plaintiff asserts that because the Amendment extended the deadline for receipt of offers and Plaintiff met that new deadline, it was irrational for the Army to reject its proposal. Specifically, Plaintiff argues that the Amendment changed the deadline for receipt of proposals, extinguishing the original deadline and starting the procurement anew. Pl.'s Posthearing Br. at 5–6. Such was not the import of this amendment. Once Argencord's initial proposal was late, it could not be revived by a subsequent timely acknowledgment of an amendment Argencord never should have received.

By issuing the Amendment to Plaintiff, the Army did not waive its right to reject Plaintiff's original offer as untimely. In *Hausted, Inc.,* B–257087, 94–2 CPD ¶ 49, GAO found that an agency which did not discover that the protestor's initial proposal had been submitted late until 19 months after the original deadline, properly rejected the protestor's proposal as late at that juncture. *Id.* at 3. The Comptroller General reasoned:

To the extent that Hausted suggests that the length of time between the initial closing date and decision to cancel the solicitation (approximately 19 months), coupled with the protestor's submission of two BA-

FOs, cures its failure to submit a timely proposal, we disagree. In an analogous situation where an agency had negotiated with an offeror for nearly 1 year, including requesting two BAFOs, we held that the agency correctly rejected the proposed awardee's proposal as late when it ultimately determined that there had not been timely receipt of the initial proposal, because the subsequent BAFOs, even if considered "new offers," were ineffective to cure the problem as they too were submitted after the initial closing date. *See G.D. Searle & Co.,* B–247077, 92–1 CPD ¶ 406. *Id.* This court, applying GAO's sound analysis in *Hausted,* concludes that Argencord's timely offer in response to Amendment 1 did not cure its late original offer. As GAO succinctly recognized in *Hausted:* "An extended period of negotiation that includes the submission of revised proposals cannot legally cure an initial late submission." *Id.*

### The Army was Not Required to Cancel the Solicitation

■ Plaintiff contends that the Amendment to the solicitation was so substantial that it required a cancellation of the Contract and a resolicitation. FAR 15.206(e) provides:

If, in the judgment of the contracting officer, based on market research or otherwise, an amendment proposed for issuance after offers have been received is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition.

48 C.F.R. § 15.206(e). The amendment here was clearly not so substantial as to exceed what offerors reasonably could have anticipated in a procurement for these parts. The amendment simply authorized an alternate material which met the Army's testing requirements. This permitted deviation did not alter the nature, function, dimensions or testing requirements of the part to be supplied. Tr. at 22–35. Plaintiff's Operations Manager testified that the difference be-

tween machined and forged ties is essentially one of process by which the ties are made, with forging resulting in a stronger tie. Tr. at 25–26. The lead time for supplying the forged parts was longer, but the manufacturing time was identical. While Plaintiff argued machined ties should have cost less, the evidence of record is inconclusive. Although Plaintiff's Operations Manager testified that the machined process was cheaper, no documentary evidence supported this conclusion, and Tek's offer for machined parts was higher-priced in the first year.

Further, although Plaintiff asserts that amending the solicitation to allow machined tie rods could not have been reasonably anticipated by offerors, its Operations Manager testified that he knew Tek had received a waiver to propose machined rods in an earlier procurement for these parts. Tr. at 43–44. As such, Plaintiff itself reasonably could have anticipated this amendment. Nor was there a basis for the CO to conclude that notifying all potential offerors of this amendment by cancelling the solicitation and resolicitating would have resulted in increased competition. Rather, the record suggests that no other sources could have competed here. The solicitation was a small business set-aside restricted to entities which had undergone requisite engineering testing and were, or would be, source-approved for the supply of these parts as of the time of award. AR at 66. Here, Plaintiff and Tek were the only approved sources for the part, and there is no evidence to suggest that other entities would timely achieve source-approved status. AR at 66.

In *Government Contract Services Co.,* B–294367, 2004 CPD ¶ 215, a protestor argued that an amendment to a solicitation for leased aircraft which allowed alternate aircraft was so substantial it warranted cancel-

lation and resolicitation. GAO rejected Plaintiff's argument and held that because substitution of aircraft identified in leasing agreements was known in the industry, the changes in the amendment were foreseeable to prospective bidders, and cancellation of the solicitation, unnecessary. *Id.* at 3. GAO reasoned:

> The ultimate availability of any aircraft is uncertain in the aircraft leasing industry, even after the passage of just a few months. Accordingly, we believe prospective offerors reasonably could have anticipated that any delay in the procurement (as was experienced here due to the time involved in the resolution of size status challenges) might reasonably necessitate the issuance of an amendment . . . to allow revised proposals for alternate aircraft when all of the acceptable offerors' previously identified aircraft became unavailable due to the delay.

*Id.* at 3–4; *accord, New Jersey v. H St. Ltd. P'ship,* B–288026, B–288026–2, 01 CPD ¶ 125 (stating that a one-year change in lease term would not be substantial under FAR 206(e)). Similarly, Plaintiff here could have anticipated an amendment authorizing alternate material and allowing machined tie rods, which Tek had supplied for these requirements in the past.

*Plaintiff Lacks Standing to Raise Other Challenges to this Award*

■ For the first time in its Posthearing Brief, Plaintiff alleges that 1) the evaluation of the offers and the price analysis were irrational, arbitrary, and capricious; 2) the alleged "waiver" permitting Tek to use alternate material was improper; 3) the solicitation should have been issued as an IFB, not an RFP;[14] and 4) Tek's submission of its

---

14. This allegation is untimely, as challenges to the solicitation must be raised prior to the deadline for receipt for offers. In so ruling, the court is not suggesting that this court must follow GAO's rules on timeliness. *See Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 353 (1997) (stating "whatever GAO's internal rules concerning assertions of claims, they cannot bind this court"). Rather, this court is simply recognizing the reality that, for meaningful relief to be fashioned, challenges to the solicitation must be made before offers are due. In general, to reme-

dy an illegal solicitation, a court would likely direct the agency to revise the solicitation to comport with statute and regulation and accurately reflect its needs, such that a fair competition could occur. It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and

offer via facsimile did not comply with the solicitation. Because its offer was admittedly late due exclusively to its own fault, Plaintiff had no chance of receiving the award and lacks standing to raise any other alleged illegalities in this procurement.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), gives this court jurisdiction in bid protest actions brought by an "interested party" objecting to a solicitation or to a proposed award or award of a contract. 28 U.S.C. § 1491(b)(1). The Federal Circuit has construed "interested party" under ADRA to comport with "interested party" as defined in the Competition in Contracting Act (CICA), 31 U.S.C. § 3551. See *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed.Cir.2004). CICA defines an "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or failure to award the contract." 31 U.S.C. § 3551(2). Thus, standing in this court under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Banknote Corp.*, 365 F.3d at 1352 (internal citation omitted).

It is well settled that in order to establish the requisite standing necessary to challenge a contract award, a disappointed bidder must show that there was a "substantial chance" that it would have received the award but for the alleged error in the procurement process. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003); *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir. 2002); *Four Points Sheraton v. United States*, 66 Fed.Cl. 776, 783 (2005). Here, because Plaintiff's offer was untimely and could not be considered for award, Plaintiff had no chance to receive the award. *Cf., Howard v. United States*, 21 Cl.Ct. 475, 478

(1990) (holding Plaintiff could not bring a claim that agency breached its duty of fair and honest consideration, where Plaintiff's proposal was late, therefore nonresponsive and not a valid offer); *Blackwell v. United States*, 23 Cl.Ct. 746, 749–50 (1991) (stating that Plaintiff whose bid was ten minutes late would have had no standing to challenge the bid process but for the fact that the Government was to blame for the bid being received late); *Hausted*, B–257087 at 3 (holding that offeror whose proposal was late was not an interested party to challenge cancellation of solicitation). Accordingly, Plaintiff lacks standing to challenge the manner in which the Army conducted this procurement.

### Other Factors for Injunctive Relief

A plaintiff that has not actually succeeded on the merits of its claim cannot prevail on its motion for injunctive relief. *Cf., Nat'l Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319, 1325 (Fed.Cir. 2004); *Int'l Resource Recovery, Inc. v. United States (IRRI)*, 64 Fed.Cl. 150, 164 (2005). As the Federal Circuit has recognized:

Although in some instances [t]hese factors, taken individually, are not dispositive because the district court's conclusion results from a process of overall balancing, *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988), a movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits. *See Amazon.com*, 239 F.3d at 1350 (noting that both "case law and logic" establish the likelihood of success on the merits and the irreparable harm factors as necessary showings to obtain a preliminary injunction). In other words, a court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits.

*Nat'l Steel Car*, 357 F.3d at 1325. Because Plaintiff has wholly failed to succeed on the

---

see if they receive award and then, if unsuccessful, claim the solicitation was infirm. *Accord, Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 358, *aff'd*, 39 F.3d 1198 (1994) (stating that if an offeror declines to challenge a problematic solicitation before submitting an offer, it may

waive its right to protest). *But see Wit Assocs. v. United States*, 62 Fed.Cl. 657, 661 (2004) and *Software Testing Solutions, Inc.*, 58 Fed.Cl. 533, 535 (2003) (allowing post-award protests to terms of solicitation).

merits of its case, injunctive relief is not warranted.

### Conclusion

1. Plaintiff's motion for permanent injunction is **DENIED**.

2. Defendant's motion for judgment on the Administrative Record is **GRANTED**.

3. The parties shall file proposed redactions to this Opinion no later than **October 5, 2005**.

4. The Clerk is directed to enter judgment for Defendant. No Costs.